IN THE SUPREME COURT OF MISSISSIPPI
NO. 92-KA-00242-SCT

*CHARLES C. HOOKER*

*v.*

*STATE OF MISSISSIPPI*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 02/04/92 |
| TRIAL JUDGE: | HON. JOHN LESLIE HATCHER |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | H. HUNTER TWIFORD, III |
| | CHARLES E. WEBSTER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIDRE McCRORY |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| | PHILLIP WEINBERG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 7/2/98 |
| MOTION FOR REHEARING FILED: | 4/4/96 |
| MANDATE ISSUED: | 7/9/98 |

EN BANC.

PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

¶1. The present case was considered by this Court in *Charles C. Hooker v. State,* No. 92-KA-00242-SCT (decided March 21, 1996). After full consideration, we grant the State's Motion for Rehearing. The original opinions are withdrawn and these opinions are substituted therefor.

¶2. This appeal arises from Charles C. Hooker's (hereinafter "Hooker") conviction in the Coahoma County Circuit Court for the March 14, 1991, murder of Walter Johnson (hereinafter "Johnson"). Hooker was indicted on June 12, 1991, pursuant to Miss. Code Ann. § 97-3-19 (1972). Hooker was tried before a Coahoma County jury that found him guilty. After the jury returned its verdict, the judge imposed a sentence of life imprisonment. Subsequently, Hooker filed his post-trial motions seeking

either a *j.n.o.v.* or a new trial. These motions were denied and Hooker timely filed his Notice of Appeal with this Court and assigns the following as error:

**I.  THE COURT ERRED IN GIVING STATE'S INSTRUCTION S-1**

> **A.  THE COURT ABUSED ITS DISCRETION IN GIVING INSTRUCTION S-1 WHICH HAD NOT BEEN PREFILED AS REQUIRED BY RULE 5.03 OF THE MISSISSIPPI UNIFORM RULES OF CRIMINAL PROCEDURE, WHICH ABUSE WAS SO PREJUDICIAL TO THE DEFENDANT AS TO AMOUNT TO A DENIAL OF DUE PROCESS.**
>
> **B.  THE COURT ERRED IN GIVING INSTRUCTION S-1 TO THE JURY BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO FIND BEYOND A REASONABLE DOUBT THAT CHARLES HOOKER ACTED "IN CONCERT WITH" OR "AIDED AND ABETTED" SOME UNKNOWN AND UNIDENTIFIED THEIR (sic) PARTIES IN THE COMMISSION OF THE CRIME.**

**II. THE COURT ERRED IN REVERSING ITS RULING ON DEFENDANT'S MOTION IN LIMINE AND ALLOWING THE TESTIMONY OF JIMMY WILLIAMS, TOMMY LOCKETT, AND CLAYTEE JOHNSON.**

**III. THE COURT ERRED IN ALLOWING THE FINGERPRINT IDENTIFICATION TESTIMONY OF CLYDELL MORGAN.**

> **A.  ALL FINGERPRINT EVIDENCE SHOULD HAVE BEEN SUPPRESSED BECAUSE THE SECOND SET OF PRINTS WAS TAINTED BY THE USE OF THE FIRST SET OF PRINTS, WHICH WAS ILLEGALLY OBTAINED AND SUBSEQUENTLY SUPPRESSED.**
>
> **B.  THE TESTIMONY OF THE FINGERPRINT EXAMINER WAS TAINTED BY HER USE OF THE FIRST SET OF FINGERPRINTS, WHICH WAS PROPERLY SUPPRESSED, IN THE FORMULATION OF HER OPINIONS.**

**IV. THE COURT ERRED IN FORCING CONTINUED JURY DELIBERATIONS LATE INTO THE NIGHT AND IN OVERRULING THE DEFENDANT'S MOTION FOR A MISTRIAL.**

**V.  THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO REQUIRE THE STATE'S EXPERTS TO DIVULGE THE BASES OF THEIR OPINIONS AND IN DENYING TO (sic) REQUESTED JURY QUESTIONNAIRE.**

**VI. CHARLES HOOKER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO A FUNDAMENTALLY FAIR AND IMPARTIAL TRIAL.**

## STATEMENT OF THE FACTS

¶3. This case is based entirely on circumstantial evidence and the events surrounding Johnson's murder are reconstructed from testimony given at Hooker's trial. Around 5:30 a.m. on the morning of March 14, 1991, a newspaper delivery man reported to the Coahoma County Sheriff's Office that he had observed a car off of old Highway 61, between Lyon and Clarksdale, in a local resident's driveway and it appeared that the driver of the car was "drunk and had passed out." The sheriff's office responded to the call and upon arriving at the rural crime scene, a Coahoma County Sheriff's deputy discovered Johnson's dead body behind the steering wheel of his blue and tan Mercury Marquis. Investigators from the sheriff's office discovered that Johnson had been shot twice in his right flank and once in his right forearm. Thereafter, investigators searched Johnson's car and found the following: 1) three .25 caliber shell casings; 2) a bag containing several unopened cans of Coors Light beer; 3) one opened, partially full can of Coors Light beer sitting on Johnson's dashboard; 4) two light colored "fibers" found stuck to Johnson's lip; 5) a .22 caliber pistol found between Johnson's legs; and 6) assorted liquor bottles, cups and papers.

¶4. The events leading to Johnson's death are sketchy. However, the evidence adduced at trial demonstrated that on the evening prior to his death, Johnson had visited the Veterans of Foreign War Post in Clarksdale and later stopped in at the Past Time Lounge in Clarksdale. Several witnesses testified that Hooker was at the Past Time Lounge during the time Johnson was present. Trial testimony indicated that while at the Past Time Lounge, Hooker and Johnson spoke to each other outside of the restroom. Testimony revealed that the conversation between the two men was short and , likewise, it did not appear to observers that there were any problems between them. From the testimony of the witnesses, it appears Johnson left the bar around 12:00 midnight. However, there are conflicting stories as to when Hooker left the lounge. O.C. Glasper testified that Hooker left the lounge around 12:45 or 12:50 in the morning, while Hooker's wife and son testified that he arrived home between 11:00 and 11:30 p.m. Nevertheless, the testimony clearly indicated that the two men left the Past Time Lounge at different times.

¶5. After leaving the Past Time Lounge, testimony revealed that Johnson entered a local Texaco convenience store at approximately 12:35 in the early morning of March 14, 1991, and purchased a six-pack of Coors Light beer from the store attendant. This was the last time anyone testified that they saw Johnson alive.

¶6. Several witnesses testified that they saw Johnson's car where it was ultimately discovered between 2:00 and 3:00 a.m. on the morning of March 14, 1991. However, none of those witnesses stopped to investigate, nor did they notice anyone in the vehicle. They did report seeing a "medium-sized or small, light-colored" car across the road from Johnson's car. No one else reported observing Johnson's car until the newspaper delivery man reported the car's whereabouts at approximately 5:30 a.m. on the morning of the 14th of March.

¶7. After questioning various people, investigators from the Sheriff's office were led to Hooker. Hooker talked to the investigators and it was learned that Hooker was a teacher at the middle school where Johnson had been principal. During the investigatory process, Hooker supplied the sheriff with several fingerprint cards. These prints were sent to the crime lab in Jackson, and ultimately the crime lab matched a latent print found on the half-full Coors Light beer can to Hooker. It was also

determined that a .25 caliber pistol belonging to Hooker was used to fire the slugs found in Johnson's body.

¶8. Hooker complains that the "bungled" murder investigation hampered his defense and, thus, deprived him of his right to a fair trial. Specifically, Hooker draws this Court's attention to the following: 1) law enforcement officers failed to preserve the integrity of the crime scene, *i.e.,* Johnson's body was moved, car doors opened, etc.; 2) light-colored fibers stuck to Johnson's lip were lost during transit to the State crime lab; 3) the half-full beer can found on the dash was emptied of its contents with no attempt made to preserve the beer so that it could be tested for body fluids on which DNA tests could be performed; 4) a .22 caliber pistol found between Johnson's legs was not tested for fingerprints; 5) Johnson's car was moved from the homicide site before the State Crime Specialist arrived to investigate the scene; 6) liquor bottles, cups and papers were found in the floorboard of Johnson's car and were not fingerprinted; 7) multiple vials of Johnson's blood were allowed to spoil at the crime lab; 8) Hooker's gun was never tested for fingerprints; 9) a holster found in Hooker's van was not tested for fingerprints; 10) there was an unexplained three-day break in the chain of custody of Hooker's gun.

¶9. On appeal Hooker contends that his conviction should be reversed for the reasons enumerated, *supra.* We find all of Hooker's assignments of error meritless and therefore, his conviction is affirmed.


**DISCUSSION**


**I. THE COURT ERRED IN GIVING STATE'S INSTRUCTION S-1.**

> **A.  The Court abused its discretion in giving instruction S-1 which had not been prefiled as required by Rule 5.03 of the Mississippi Uniform Rules of Criminal Procedure, which abuse was so prejudicial to the defendant as to amount to a denial of due process.**

¶10. Hooker argues that the trial judge abused his discretion when he allowed the prosecution to submit Jury Instruction S-1 on January 22, 1992. The trial commenced on January 20, 1992, and Hooker argues that pursuant to Miss. Unif. Crim. R. Cir. Ct. Prac. 5.03, S-1 should have been submitted before the start of the trial. Hooker contends that the trial judge's decision to allow the State to submit S-1 prejudiced the defense of his case and therefore, his conviction should be reversed.

¶11. Miss. Unif. Crim. R. Cir. Ct. Prac. 5.03 provides in part:

> At least twenty-four hours prior to the time that a case is set for trial each of the attorneys shall number and file his jury instructions with the clerk and submit to opposing counsel a numbered copy of the instructions so filed in the case...Except for good cause shown, the court will not entertain a request for additional instruction or instructions which have not been prefiled in

accordance with the above.

¶12. Unif. Crim. Ct. R. Cir. Ct. Prac. 5.03 does require that both parties submit their prospective jury instructions 24 hours prior to the start of trial. However, the rule also provides: "**[e]xcept for good cause shown, the court will not entertain a request for additional instruction or instructions which have not been prefiled in accordance with the above.**" Apparently, if a party can show good cause for not complying with the 24 hour prefiling requirement, the trial court may permit the party to submit jury instructions at trial.

¶13. In *Shaw v. State,* 540 So. 2d 26, 29-30 (Miss. 1989), this Court stated:

> "...failure to follow the dictates of Rule 5.03, Crim.R.Cir.Ct.Prac., will not lead to reversal absent actual prejudice to the defendant." *See also* ***Carter v. State,*** 493 So. 2d 327, 331 (Miss. 1986). In the case *sub judice,* Hooker argues that he was prejudiced because he had no idea that the prosecution was going to inject "in concert with" and "aiding and abetting" as alternative grounds for conviction until minutes before he was to start his case.

¶14. Notwithstanding Hooker's claim, the record indicates that the State presented this alternative theory in its opening argument. Furthermore, Hooker's own defense was that although his fingerprint was found on a beer can found in Johnson's car and although his pistol was used to kill Johnson, someone else killed Johnson. Accordingly, it does not appear that Hooker was caught totally unaware that the State might attempt to prove that others were involved in Johnson's murder with Hooker. We find that Hooker suffered no prejudice as a result of the trial judge allowing the tardy S-1 jury instruction, and this claim is without merit.

### B. The court erred in giving instruction S-1 to the jury because there was insufficient evidence to find beyond a reasonable doubt that Charles Hooker acted "in concert with" or "aided and abetted" some unknown and unidentified their (sic) parties in the commission of the crime.

¶15. Jury instruction S-1 allowed the jury to find Hooker guilty of murder under two theories. First, the jury could find that Hooker actually killed Johnson. Second, the jury could find that Hooker aided and abetted in the murder of Johnson. Hooker argues that the lower court erred in submitting the jury instruction because it was not supported by the evidence, and accordingly, his conviction should be reversed.

¶16. The record reveals that in opening argument, the State revealed its secondary theory that others were present with Hooker on the night in question. The evidence consisted of the testimony of eyewitness Tanya Moore who testified to facts that, if believed by the jury, would prove that two men got into Johnson's car at the Past Time Lounge and drove off with Johnson. Neither of these two men was Hooker. Witnesses testified that they saw a light-colored car across from Johnson's car at or around 3:00 a.m. on March 14, 1991. A Coors Light beer can found on Johnson's dash had a thumb print from Hooker. Ann Ingram testified that Johnson bought the beer around 12:30 a.m. on March 14, 1991. The State's fingerprint expert, Clydell Morgan, testified that there were three unidentified

latent prints found in Johnson's car. The State's request for S-1 was to conform to the proof adduced during the trial. A reasonable juror could certainly have inferred from the testimony that someone else could have been involved in Johnson's murder.

¶17. Ballistics evidence revealed that the gun used to kill Johnson was owned by Hooker. Testimony by Hooker's wife and son revealed that he often carried the gun when he went out at night. The gun was found in a night stand beside Hooker's bed. O.C. Glasper testified that Hooker, contrary to his wife's and son's testimony, did not leave the Past Time Lounge until sometime close to 12:30 a.m. on March 14th.

¶18. Even Hooker's theory of defense suggested that others killed Johnson. Hooker claimed an alibi, that he was at home at the time of the murder. Hooker's defense was in effect that unidentified men who left the Past Time Lounge with Johnson were his killers. Hooker argued that in spite of his fingerprint being found on a beer can that Johnson had purchased shortly before his death and that was recovered from Johnson's car, and although his pistol was used as the murder weapon and somehow ended up in his night stand, nevertheless, someone else killed Johnson.

¶19. This Court follows the general rule that all instructions should be supported by the evidence in the record. *Brazile v. State,* 514 So. 2d 325, 326 (Miss. 1987). This Court, in the recent case of *Swinford v. State,* 653 So. 2d 912, 915 (Miss. 1995), stated:

> [a]ny person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender.

*Swinford,* 653 So. 2d at 915 (quoting *Sayles v. State,* 552 So. 2d 1383, 1389 (Miss. 1989)).

¶20. Hooker argues as in *Sayles* that the jury instruction was improper because the evidence did not support it and the instruction was an abstract statement of the law. The *Sayles* Court discussed the primary difference between an "aider and abettor" and accessory-before-the-fact. That primary difference is that if a person is actually or constructively present at the offense, due to his participation, he is an aider and abettor; if not present, he is an accessory-before-the-fact. *Sayles,* 552 So. 2d at 1389. This Court in *Sayles* held that the challenged instruction was one dealing with aiders and abettors. Returning to the case *sub judice*, Instruction S-1 is clearly an instruction concerning "aiders and abettors." As in *Sayles*, the facts in this case support the aiding and abetting instruction. The evidence, although circumstantial in nature, nevertheless, was sufficient to demonstrate that Hooker was an aider and abettor as defined in *Sayles.* A jury is allowed to draw all reasonable inferences from the evidence. *Jackson v. State,* 614 So. 2d 965, 972 (Miss. 1993).

¶21. Hooker's complaint that Instruction S-1 was abstract is also without merit. In *Pickett v. State,* 443 So. 2d 796, 800 (Miss. 1983), this Court held that when abstract instructions could not confuse or mislead the jury, the granting of such does not constitute reversible error. *See also Sayles,* 552 So. 2d at 1389. The jury was properly instructed regarding murder. The circumstantial evidence was such that the jury could have found Hooker aided or abetted in the murder of Johnson. The challenged instruction applied the facts to the law. This assignment of error is without merit.

**II. THE COURT ERRED IN REVERSING ITS RULING ON DEFENDANT'S MOTION IN LIMINE AND ALLOWING THE TESTIMONY OF JIMMY WILLIAMS, TOMMY LOCKETT AND CLAYTEE JOHNSON.**

¶22. Hooker argues that the trial judge erred in allowing the testimony of Jimmy Williams, Tommy Lockett, and Claytee Johnson concerning the victim Johnson's habit of parking in a certain location late at night. Hooker claims the three witnesses' testimony implied that Hooker and Johnson were engaged in some type of homosexual liaison. This allegation is not supported by the record. The trial judge initially granted Hooker's Motion in Limine but stated that he would reconsider if the State reasserted its relevance at a later time.

¶23. The question to be answered is whether the testimony of the three witnesses was relevant evidence. The State sought introduction of their testimony to show that Johnson had a habit of driving in the area north of Lyon late at night and parking beside the road and that Hooker had knowledge of this habit of Johnson. The testimony offered clearly showed that Johnson frequented the area where his car and body were found. There was testimony that on three occasions prior to the murder, the three witnesses had been called by Johnson late at night to help him get his car out of a field. The testimony also showed that on one of these occasions when Johnson's vehicle was stuck in the mud, Hooker's van was spotted parked behind Johnson's car, hence knowledge by Hooker of Johnson's habit.

¶24. Rule 406 of the Mississippi Rules of Evidence is identical to Rule 406 of the Federal Rules of Evidence and thus, the advisory committee notes on the Federal Rules of Evidence are helpful in determining whether the evidence presented in this case meets the requirements of habit. The advisory committee notes on the Federal Rules of Evidence define habit as:

> "...A habit...is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of habitual acts may become semi-automatic."

Fed.R.Evid. 406 advisory committee's note (quoting C. McCormick, Handbook of the Law of Evidence § 162 at 340). *See also United States v. Sampol,* 636 F.2d 621, 657 n.21(D.C. Cir. 1980). The regularity of the conduct alleged to be habitual, rests on an analysis of instances "'numerous enough to base an inference of systematic conduct' and to establish 'one's regular response to a repeated specific situation.'" *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 511 (4th Cir. 1977)(quoting *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1158 (2nd Cir. 1968) and McCormick on Evidence § 162 (1964)). Of course, in the case *sub judice,* the State had the burden of proving habit.

¶25. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss.R.Evid. 401. Rule 403 of the Mississippi Rules of Evidence reads, "[a] lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence." This rule necessarily vests a certain amount of discretion with the trial judge. *Stokes v. State,* 548 So. 2d 118, 125 (Miss. 1989), *cert. denied,* 493 U.S. 1029 (1990).

¶26. The testimony in question was evidence that made the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Miss.R.Evid. 401. Thus, the factor to be considered was whether Hooker knew where to look to find Johnson in the early morning hours of March 14th. The offered evidence was relevant to show that even if Hooker was home by 1:30 p.m., it was still possible that he could have left his house, found Johnson's car at the place that he knew to look for it, and shot and killed him. The evidence clearly established Johnson's habit of parking at a particular area beside the road late at night. The fact that Johnson's body was discovered in his car at that exact spot supports the three witnesses' testimony of habit. There was no abuse of discretion by the trial judge in allowing into evidence this relevant evidence. This assignment of error is without merit.

### III. THE COURT ERRED IN ALLOWING THE FINGERPRINT IDENTIFICATION TESTIMONY OF CLYDELL MORGAN.

**A. All fingerprint evidence should have been suppressed because the second set of prints was tainted by the use of the first set of prints, which was illegally obtained and subsequently suppressed.**

¶27. Hooker first argues that all fingerprint evidence should be suppressed as the "fruit of the poisonous tree," *Wong Sun v. United States,* 371 U.S. 471 (1963); *Rooks v. State,* 529 So. 2d 546, 555 (Miss. 1988), because the State did not prove that it informed Hooker prior to taking the first set of prints that he had the right to refuse the request that he give the police his prints. Hooker gave two sets of fingerprints to the sheriff's office. The first set was given on March 19, 1991, and the second set was given on March 28, 1991. The trial court did suppress the first set of prints, but refused to suppress a second set ruling that on March 28, 1991, Hooker had been properly informed that he had the right to refuse to give his prints. On appeal, Hooker argues that because the second set of prints were not "independently obtained", they too should be suppressed.

¶28. The taking of fingerprints is a search for purposes of the Fourth Amendment to the Constitution of the United States of America. *Davis v. Mississippi,* 394 U.S. 721, 724 (1969). In Mississippi, the defendant has the right to be informed that he can refuse the search. *Penick v. State,* 440 So. 2d 547, 558 (Miss. 1983). However, all evidence obtained by virtue of illegal actions of the police is not "fruit of the poisonous tree." "The test is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality instead of by means sufficiently distinguishable to be purged of the primary taint.'" *Yates v. State,* 467 So. 2d 884, 887 (Miss. 1984)(quoting *Wong Sun v. United States* 371 U.S. 471, 487 (1963)).

¶29. In the case *sub judice,* the trial judge found that the second set of fingerprints Hooker gave to the sheriff's department was voluntarily given and that Hooker was informed of his right to refuse to give the fingerprints. The evidence overwhelmingly supports the trial judge's finding that the second

set of prints was voluntarily given, and Hooker was informed of his right to refuse the search. *Harrigill v. State,* 381 So. 2d 619, 623 (Miss. 1980). Thus, the dispositive question appears to be whether the second set of fingerprints was obtained by exploiting the first set of "illegally" seized fingerprints as opposed to gaining the second set by some means independent of the "taint" of the suppressed first set of prints. *Yates,* 467 So. 2d at 887.

¶30. The "illegally" seized first set of prints did not result in the police discovering the second set of prints. The first set of Hooker's prints were smudged and the State crime lab informed the sheriff that they would require a second set. The sheriff called Hooker at work and asked if he could come to the sheriff's office and give a second set of prints. Hooker agreed and in turn was informed of his right to refuse the request for his prints. At the suppression hearing, the trial judge found that Hooker had been adequately informed of his right to refuse the second set of prints.

¶31. The second set of fingerprints was not gained by exploiting the illegally seized first set of fingerprints. Therefore, because the evidence supports the trial judge's determination that the second set of prints were voluntarily given, this assignment of error is without merit. *Wiley v. State,* 449 So. 2d 756, 759-60 (Miss. 1984).

### B. The testimony of the fingerprint examiner was tainted by her use of the first set of fingerprints, which was properly suppressed, in the formulation of her opinions.

¶32. Hooker contends that the fingerprint examiner's testimony was tainted because she could not say that she did not use the suppressed first set of prints in effecting her initial match of Hooker's thumbprint to the beer can found in Johnson's car on the morning of March 14, 1991. Therefore, Hooker argues, the print examiner's testimony should have been excluded.

¶33. During voir dire, Clydell Morgan, the fingerprint examiner, testified that when she effected the initial identification of Hooker's thumbprint on the Coors Light beer she had both the first set and second set of Hooker's prints before her. However, Morgan could not testify whether initially, she used the first set of prints (the subsequently suppressed set) or the second legally obtained set of prints to match Hooker's thumbprint found on the beer can.

¶34. During a break in the trial, Morgan was allowed to compare the second set of prints with the latent print removed from the Coors Light beer can. At trial, and before the jury, Morgan testified that the thumbprint matched the known thumbprint of Hooker. This identification was accomplished solely through the use of the non-suppressed second set of prints. Likewise, this identification was not based on the suppressed first set of prints. Therefore, we find that this assignment of error is meritless.

### IV. THE COURT ERRED IN FORCING CONTINUED JURY DELIBERATIONS LATE INTO THE NIGHT AND IN OVERRULING THE DEFENDANT'S MOTION FOR A MISTRIAL.

¶35. Hooker assigns as error the trial judge's decision to begin jury deliberations on the evening of January 24, 1992, after both sides had rested their respective cases at approximately 4:00 p.m.

Hooker claims that the jury initially was in favor of beginning its deliberations on the morning of January 25, 1992, but was coerced into changing its mind after being informed by the trial judge that they would be sequestered if they chose to start the next morning.

¶36. "Ordinarily, trial judges have broad discretion in determining when trials will begin and how long they will continue on any given day." *Dye v. State,* 498 So. 2d 343, 344 (Miss. 1986). There is not a "bright line rule" as to when a trial judge should grant a continuance or recess. Necessarily then, our analysis focuses upon the unique facts of each case. To support his position that the trial judge abused his discretion in allowing the jury to deliberate into the night, Hooker cites *Isom v. State,* 481 So. 2d 820 (Miss. 1985), *Grimsley v. Tyner,* 454 So. 2d 482 (Miss. 1984), *Edge v. State,* 393 So. 2d 1337 (Miss. 1981), and *Thornton v. State,* 369 So. 2d 505 (Miss. 1979).

¶37. In *Isom,* after a day and a half of hearing the trial of the defendant's murder case, the jury deliberated from 3:21 p.m. until 10:38 p.m. without reaching a verdict. Three of the jurors expressed their desire to recess deliberations at that time. Nonetheless, the trial court sent the jury back for further deliberations and at 11:35 p.m., the jury finally reached a verdict of manslaughter. On appeal, this Court held that seven hours of jury deliberation under the facts of that particular case was excessive, where the length of the trial was relatively short as opposed to the length of deliberations and where several jurors expressed a desire to begin deliberations anew the next day. *Isom,* 481 So. 2d at 824.

¶38. In *Grimsley*, the jury heard a paternity case until 11:00 p.m. and was then forced to begin its deliberations. The jury returned its verdict at 4:30 a.m. the next morning. On appeal, we stated that "[t]his Court will look closely at records and verdicts rendered under such circumstances." *Grimsley*, 454 So. 2d at 485. This Court expressed its concern with such deliberations, but ultimately reversed the case on other grounds.

¶39. In *Edge,* we reversed the defendant's conviction because the trial judge's refusal to allow his attorney a continuance denied the defendant his Sixth Amendment right to effective assistance of counsel. The attorney in *Edge* had asked for a continuance at approximately 6:30 p.m. after having spent the morning selecting the jury. The jury was seated by 3:30 p.m. and the trial commenced. The defendant's attorney, feeling exhausted and taking medication, asked that the trial be recessed until the morning. The trial judge, anxious to complete the entire murder trial in two days, refused at 6:30 p.m. to stop the proceedings for the evening. *Edge,* 393 So. 2d at 1342. We reversed and held that the judge's refusal to recess the trial until the next morning denied the defendant his right to effective assistance of counsel at the most crucial stage of his trial, that stage being the beginning of the presentation of his defense. *Id.*

¶40. In *Thornton,* we held that the trial court denied the defendant his Sixth Amendment right to effective assistance of counsel when it refused to grant a recess as requested by defense counsel. In that case, the State rested its case-in-chief at about 6:00 p.m. and the defense counsel moved for a recess stating that he was exceedingly tired. The trial judge refused to grant the defendant's request for a recess. Subsequently, the defendant was forced to put on his defense which lasted until approximately 10:00 p.m. The parties had to then submit their objections to the submitted jury instructions and then make closing arguments. Both sides were given one hour for closing. After making closing arguments, the defendant's attorney became ill and was rushed to the hospital.

***Thornton,*** 369 So. 2d at 506.

¶41. In the case *sub judice,* the State's rebuttal was completed and the State rested at 3:35 p.m. Hooker stated that he would prefer to start jury deliberations in the morning but would leave that decision to the trial court's discretion. The judge asked the jurors if they preferred to start deliberations the next day or begin that evening. The record indicates that one juror expressed his desire to begin deliberations the next day. At this point, the trial judge informed the jurors that if they chose to begin the next day, they would be sequestered for the night.

¶42. The court recessed and allowed the jury to discuss whether they wanted to continue or not. All twelve of the jurors and the four alternates voted to begin deliberations that evening. Closing arguments commenced at 4:35 p.m. and the jury retired to deliberate at 6:45 p.m. At 7:45 p.m. the jury asked for further instructions on "aiding and abetting." This request was refused by the court. At 9:15 p.m. the jury asked if it could review any of the testimony given during the trial. The jury was told that the testimony had not been transcribed. At 10:23 p.m. the jury announced that it was divided by an eight to four vote. Three of the jurors stated that they did not feel that they could reach a unanimous verdict by deliberating further. Thereafter, the trial judge read Jury Instruction C-40, the approved version of the "Sharplin Charge", to the jury. *See **Sharplin v. State,*** 330 So. 2d 591 (Miss. 1976).

¶43. The jury retired at 10:40 p.m. and at 11:45 p.m. returned its verdict. The jury found Hooker guilty of murder. We find that the trial judge did not abuse his discretion in refusing to wait and begin jury deliberations on the following day. The hearing of this trial lasted approximately four days and encompassed many witnesses. The jury deliberated for approximately five hours before returning its verdict. Likewise, neither the jurors nor Hooker's attorneys expressed a feeling of exhaustion or fatigue. Thus, we find that Hooker was not denied the effective assistance of counsel, ***Thornton, supra,*** nor was the jury's verdict suspect such as was the case in ***Grimsley*** and ***Isom.*** Therefore, we find this assignment of error to be meritless.

### V.  THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO REQUIRE THE STATE'S EXPERTS TO DIVULGE THE BASES OF THEIR OPINIONS AND IN DENYING TO (sic) REQUESTED JURY QUESTIONNAIRE.

¶44. Hooker argues that during pretrial proceedings, he requested that the State provide him with the facts upon which its experts would rely and the bases for their opinions. Hooker does not argue that he was denied the opportunity to contact the State's experts and determine from the experts on what facts they based their opinions or the bases of those opinions. Because the Mississippi Uniform Criminal Rules of Circuit Court Practice do not provide for the same minimal discovery benefits as do the civil rules, Hooker argues that he was denied his right to due process under Article 3, Section 14 of the Mississippi Constitution (1890) and under the Fifth and Fourteenth Amendments to the Constitution of the United States of America. Hooker also argues that the trial court denied him his right to due process by refusing his request for a jury questionnaire.

¶45. Rule 4.06(d) of the Miss. Unif. Crim. R. Cir. Ct. Prac. provides:

(d) Except as is otherwise provided or in cases where the witness would be forced to reveal self-incriminating evidence, neither the counsel for the parties nor other prosecution or defense personnel shall advise persons having relevant material or information, except the accused, to refrain from discussing the case with opposing counsel or showing opposing counsel any relevant material, nor shall they otherwise impede opposing counsel's investigation of the case.

Hooker does not argue that he was not allowed to talk to any of the State's expert witnesses or that the prosecution told the experts not to talk to him. Likewise, he does not argue that he was not informed of the names of the State's experts. Instead, he argues that the Mississippi Uniform Rules of Circuit Court Practice should contain a provision that requires the prosecution to *provide* the defense with the facts upon which its experts depend, as well as the bases for their opinions.

¶46. Hooker does not allege or demonstrate that the State failed to comply with Rule 4.06. The State called three expert witnesses. The State's witnesses were known to Hooker and he could have discussed the case with them. Likewise, Hooker does not point to any testimony at trial by the experts that resulted in any unfair surprise to him. Accordingly, we find that this assignment of error is without merit.

¶47. Hooker also argues that he was denied his right to due process when the trial judge refused to allow him to use a jury questionnaire. Our case law does not indicate that a defendant in a criminal case has an absolute right to submit a jury questionnaire. In ***Lutes v. State,*** 517 So. 2d 541, 547 (Miss. 1987), the defendant argued that the trial judge erred in refusing to allow him to submit a jury questionnaire. This Court found no merit in the defendant's contention and dismissed the assignment of error as meritless. In the case *sub judice,* Hooker was allowed wide latitude during voir dire and some of the voir dire was conducted in chambers. Upon a thorough review of the record, it is clear that Hooker was allowed to ask many of the questions that appeared on his proposed jury questionnaire. We find no prejudice to the defendant in refusing to allow the questionnaire, and find this assignment of error to be meritless.

### VI. CHARLES HOOKER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO A FUNDAMENTALLY FAIR AND IMPARTIAL TRIAL.

¶48. Hooker's last assignment of error is for the most part an attempt to reargue his first five assignments of error. However, Hooker also takes this opportunity to attack the way that the Coahoma Sheriff's Office conducted the murder investigation. Hooker contends that the accumulation of errors by the investigators deprived him of a fundamentally fair and impartial trial. *See **Brady v. Maryland,*** 373 U.S. 83 (1963). Hooker points to various transgressions alleged to have been committed by law enforcement officials investigating Johnson's murder. These errors, Hooker argues, deprived him of possible exculpatory evidence and the opportunity to discredit the State's case.

¶49. In the case *sub judice,* as was the case in ***Johnston v. State,*** 618 So. 2d 90, 92-93 (Miss. 1993), Hooker's defense was alibi. Hooker's wife and son testified that Hooker was home by 11:30 on the night of March 13, 1991, and did not go out again that night. The points Hooker has raised in his brief concerning lost or mishandled evidence did not affect his ability to present the defense of alibi. Necessarily, if the jury had chosen to believe Hooker's alibi witnesses, they could not have found

Hooker guilty of Johnson's murder because testimony indicated that Johnson was alive at 12:30 a.m. on the morning of March 14, 1991. Therefore, the last time Johnson was seen alive was approximately one hour after Hooker's wife and son testified that Hooker came home, showered and went to bed for the night.

¶50. Hooker makes much ado about the loss of the light colored fibers that were found stuck to Johnson's lips. However, the jury was able to view two pictures of the fibers. Hooker also claims that the contents of the beer can found on the dash were emptied, thus depriving him of the chance to obtain possible saliva tests. However, Hooker does not establish that if there was any saliva or other bodily fluids contained in the beer can, that tests were available to extract the fluids from the beer to allow for a determination of blood type, sex, race, etc. Hooker also takes issue with the fact that a vial of blood taken from Johnson spoiled while at the crime lab. Hooker does not however, state how this blood could have been exculpatory.

¶51. Hooker asks this Court to speculate on whether this evidence might have been exculpatory. He does not state how the evidence could have been exculpatory, nor does he attempt to show how he has been prejudiced. Equally, if not more importantly, is that Hooker does not show that any of these complaints regarding the investigation and gathering and presentation of evidence affected his alibi defense. That is because his alibi defense was not affected. Hooker, while not receiving a perfect trial, nevertheless, received a fair trial. *Sand v. State,* 467 So. 2d 907, 911 (Miss. 1985). This assignment of error is meritless.

## CONCLUSION

¶52. We find that Hooker received a fair trial. The jury properly heard and considered all the evidence and determined Hooker was guilty as charged. We find no error on the part of the trial court, and find that all of Hooker's assignments of error are meritless. Therefore, the verdict of the jury shall stand, and this case is affirmed.

¶53. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. THE SENTENCE IMPOSED IN THIS CAUSE SHALL RUN CONSECUTIVELY WITH ANY AND ALL SENTENCES PREVIOUSLY IMPOSED.**

**ROBERTS, SMITH, MILLS, AND WALLER, JJ., CONCUR. SULLIVAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., AND McRAE, J. BANKS, J., JOINS THIS OPINION AS TO PART I.**


**SULLIVAN, PRESIDING JUSTICE, DISSENTING:**

¶54. Because Charles C. Hooker has not received a fair trial, his conviction should be reversed, and he should receive a new trial. Accordingly, I respectfully dissent with the majority regarding Issues I.B. and II.

## I. THE COURT ERRED IN GIVING STATE'S INSTRUCTION S-1

### B. THE COURT ERRED IN GIVING INSTRUCTION S-1 TO THE JURY BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO FIND BEYOND A REASONABLE DOUBT THAT CHARLES HOOKER ACTED "IN CONCERT WITH" OR "AIDED AND ABETTED" SOME UNKNOWN AND UNIDENTIFIED THEIR (sic) PARTIES IN THE COMMISSION OF THE CRIME.

¶55. While the evidence at trial may have supported the State's theory that Hooker killed Johnson, none of the evidence supported a finding that Hooker, along with other suspects, were involved in Johnson's murder. Nonetheless, the State was allowed a jury instruction that enabled the jury to find Hooker guilty of murder if it found that he aided and abetted in the murder of Johnson.

¶56. Hooker's defense was twofold: first, witnesses testified that he was home at the time of the murder, and second, Johnson was seen leaving the Past Time Lounge with two men, neither of whom were Hooker. At trial the two unknown men were not linked to Hooker in any way, whether by physical evidence or by testimony. There simply was not enough proof to find that Hooker aided and abetted in the murder of Johnson and, therefore, it was error to give Jury Instruction S-1.

¶57. In the recent case of **Swinford v. State**, 653 So. 2d 912 (Miss. 1995), this Court, quoting **Sayles v. State**, 552 So. 2d 1383, 1389 (Miss. 1989), stated:

> "[a]ny person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor'and is equally guilty with the principal offender."

**Swinford**, 653 So. 2d at 915 (internal citations omitted). Quoting **Walters v. State**, 218 Miss. 166, 65 So. 2d 465, 467 (1953), we then stated:

> [I]n the case of *Wynn v. State*, 63 Miss. 260 [(1885)], the Court said: **"Aiding and abetting is defined to be 'the offense committed by those persons who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator.' . . . And such aiding and abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition."**

**Swinford**, 653 So. 2d at 915 (emphasis added).

¶58. In a criminal case, the burden is on the State to prove the defendant's guilt through evidence which satisfies each element of the charged crime. **Hedrick v. State**, 637 So. 2d 834, 837 (Miss. 1994) (*citing* **McVeay v. State**, 355 So. 2d 1389 (Miss. 1978)). The prosecution must prove all of the elements of the crime beyond a reasonable doubt, **Hedrick**, 637 So. 2d at 839, and this burden never

shifts from the State. *Brown v. State*, 556 So. 2d 338, 339 (Miss. 1990).

¶59. Jury Instruction S-1 instructed the jury to find Hooker guilty of Johnson's murder if Hooker "by his own act or by acting in concert with or aiding and abetting another did willfully, of his deliberate design and without the authority of law, cause the death of Walter Johnson, by shooting him with a pistol." Therefore, in order to find Hooker guilty of Johnson's murder, the jury had to find, beyond a reasonable doubt, that Hooker actually shot Johnson or that Hooker aided, counseled, or encouraged others in the commission of Johnson's murder. *See Simmons v. State*, 568 So. 2d 1192, 1204 (Miss. 1990).

¶60. It is well settled under Mississippi law that jury instructions are not given unless there is an evidentiary basis in the record for such. *Perry v. State*, 637 So. 2d 871, 877 (Miss. 1994); *Haddox v. State*, 636 So. 2d 1229, 1238 (Miss. 1994); *Givens v. State*, 618 So. 2d 1313, 1320 (Miss. 1993). On appeal Hooker correctly points out that there was no evidence or testimony adduced at trial to establish the requisite elements of aiding and abetting.

¶61. The record is simply devoid of any proof that Hooker, through acts, words, signs, motions, or any other conduct, evinced a design to encourage, incite or approve of Johnson's murder. *Swinford*, 653 So. 2d at 915. The majority concludes that the jury could have found that Hooker aided and abetted in Johnson's murder based solely upon the evidence that two unidentified men left the Past Time Lounge with Johnson, and three unidentified latent prints were found in Johnson's car. While the jury is allowed to draw all reasonable inferences from the evidence, *Jackson v. State*, 614 So. 2d 965, 972 (Miss. 1993), in the case at bar, any finding by the jury that Hooker aided and abetted in the murder of Johnson would be based purely on speculation. The unidentified latent prints could have been left at any time by anyone who had been in Johnson's car, so their existence lends nothing to the State's theory that Hooker was guilty of aiding and abetting. Since there was no testimony to link Hooker to the two men leaving the lounge with Johnson, that evidence likewise does not support a finding that Hooker aided and abetted them in Johnson's murder.

¶62. Allowing an instruction on aiding and abetting was error, and it cannot be said that the inclusion of the aiding and abetting language in S-1 was harmless. A review of the record clearly indicates that the jury was hung up on the question of whether Hooker had aided and abetted in the murder of Johnson. In fact, at one point during the deliberations, the jury sought additional instructions as to "aiding and abetting." The trial court's use of Jury Instruction S-1 was reversible error, because the instruction on aiding and abetting was unsupported by the evidence. *Perry v. State*, 637 So. 2d 871, 877 (Miss. 1994); *Haddox v. State*, 636 So. 2d 1229, 1238 (Miss. 1994); *Givens v. State*, 618 So. 2d 1313, 1320 (Miss. 1993).

### II. THE COURT ERRED IN REVERSING ITS RULING ON DEFENDANT'S MOTION IN LIMINE AND ALLOWING THE TESTIMONY OF JIMMY WILLIAMS, TOMMY LOCKETT AND CLAYTEE JOHNSON.

¶63. The majority concludes that the testimony of Jimmy Williams, Tommy Lockett, and Claytee Johnson was admissible and relevant to show that it was Johnson's habit to park late at night in the vicinity where his body was found. The majority further finds that the testimony was relevant to show that Hooker had knowledge of Johnson's nocturnal parking habits. The State's theory at trial was

that, even if Hooker was at home by 11:30 p.m., as testified to by his wife and son, he knew that it was Johnson's habit to go out late at night and park there. Accordingly, the State surmises that on the early morning of March 14, Johnson parked his car along the side of the road in the area north of Lyon, as was his habit. The State maintains that Hooker had knowledge of Johnson's "habit" and, thus, although Hooker did not leave the Past Time Lounge with Johnson, Hooker knew where to look for Johnson and subsequently found him.

¶64. Under Rule 406 of the Mississippi Rules of Evidence, competent evidence of a person's "habit" may be admissible to prove conduct in conformity with the habit on a particular occasion. "[H]abit refers to the type of nonvolitional activity that occurs with invariable regularity." *Weil v. Seltzer*, 873 F. 2d 1453, 1460 (D.C. Cir. 1989). "It is the nonvolitional character of habit evidence that makes it probative." *Weil*, 873 F. 2d at 1460 (citing *Levin v. United States*, 338 F. 2d 265, 272 (D.C. Cir. 1964) (testimony concerning religious practices not admissible because "the very volitional basis of the activity raises serious questions as to its invariable nature, and hence its probative value"), *cert. denied*, 379 U.S. 999, 85 S. Ct. 719, 13 L. Ed. 2d 701 (1965)). "Habits have a reflexive, almost instinctive quality." *Weil*, 873 F. 2d at 1460. *See also* *United States v. Pinto*, 755 F. 2d 150 (10th Cir. 1985).

¶65. The burden of proving habit is placed on the proponent of the evidence. *Weil*, 873 F. 2d at 1461. While there are no precise standards for determining whether a behavior pattern has matured into habit, as a general rule two factors are considered controlling: "adequacy of sampling and uniformity of responses." Fed.R.Evid. 406 advisory committee's note; *United States v. Newman*, 982 F. 2d 665, 668 (1st Cir. 1992); *McWhorter v. City of Birmingham*, 906 F. 2d 674, 679 (11th Cir. 1990).

¶66. One of the prime concerns over the reliability of habit testimony is that the conduct at issue may not have occurred with sufficient regularity to make it more probable than not that it would be carried out in every instance or in most instances. *Levin*, 338 F. 2d at 272. The requisite regularity is tested by the ratio of reaction to situations. *Wilson v. Volkswagen of Am., Inc.*, 561 F. 2d 494, 512 (4th Cir. 1977) (*quoting* Lewan, *Rationale of Habit Evidence*, 16 Syracuse L.Rev. 39, 51 (1964)), *cert. denied*, 434 U.S. 1020, (1978). Accordingly, it is essential that the regularity of the conduct alleged to be habitual rest on an analysis of instances "'numerous enough to base an inference of systematic conduct' and to establish 'one's regular response to a repeated specific situation' . . . ." *Wilson*, 561 F. 2d at 511 (citations omitted).

¶67. Upon a review of the testimony in this case, the witnesses in question could testify cumulatively to three instances in which they observed Johnson parked and stranded in the vicinity of the murder scene. Williams testified that he was out late at night in the vicinity of the murder scene on five or six additional occasions. However, Williams did not testify that he observed Johnson or his car on these five or six occurrences. Thus, out of the eight to nine times Williams was in the vicinity of the murder scene, he testified that he saw Johnson on three of those episodes. Also, Williams, the only witness who could testify as to all three events in which Johnson became stuck, gave inconsistent answers as to the time frame in which the three incidents occurred. At first he testified that the first incident occurred approximately three or four months prior to March 14, 1991. Then Williams testified that the first event might have occurred in September. (Williams testified that the first and second event occurred about a month apart and that the second event occurred in October). Finally, on cross-

examination, Williams testified that the first event could have occurred as early as June of the previous year. Claytee Johnson's and Tommy Lockett's testimony as to the time frame of the incidents is equally unavailing.

¶68. Except for Williams's testimony that he saw Hooker's van near Johnson's car the first time Johnson got stuck, none of the witnesses could testify that they had seen Hooker or his van with or near Johnson on any of the remaining nights he had elicited their help. On two of the three occasions Johnson sought their help, Williams, Lockett, and Claytee Johnson testified that they saw Johnson with an unknown man. At trial the State asked the witnesses numerous times whether or not the man seen with Johnson on these two occasions was Hooker. Despite repeated questioning as to the unknown man's identity, none of the witnesses could identify Hooker as being that man. In fact, Williams admitted on cross-examination that he could not even be absolutely positive that the unknown "man" with Johnson was in fact a man.

¶69. Certainly, habit may be inferred from proof of specific instances of conduct. Nonetheless, after reviewing the evidence in the case at bar, it cannot be said that the prosecution's proof of three incidents spread over a period of four to eight months meets the test of frequency and regularity to be habit evidence. *See* ***Pacesetter Corp. v. Barrickman***, 885 S.W. 2d 256, 263 (Tex.Ct.App. 1994) (defendant's offer of two incidents insufficient to establish habit as to how company handled workers' compensation claims); ***Weil v. Seltzer***, 873 F. 2d 1453, 1460 (D.C. Cir. 1989) (evidence of how physician treated five former patients insufficient to establish habit); ***United States v. Pinto***, 755 F. 2d 150, 152 (10th Cir. 1985) (proof that defendant, while drunk, entered wrong home four times over eight years insufficient to show that it was his habit to get drunk and enter wrong home).

¶70. Evidence concerning the three incidents in which Johnson elicited the trio's help is not of the nonvolitional, habitual type that guarantees its probative value. Since the testimony was insufficient to establish habit, it was error for the judge to allow the trio's testimony to show that Hooker had knowledge of Johnson's alleged habit of parking along the road late at night. Accordingly, it was error to allow the introduction of this highly prejudicial evidence.

## CONCLUSION

¶71. The trial court erred in allowing Jury Instruction S-1 to be presented to the jury when there was no evidence to support a finding that Hooker aided and abetted in the murder of Walter Johnson. Also, the trial judge's decision to allow Jimmy Williams, Claytee Johnson and Tommy Lockett to testify as to Johnson's habit of parking off the road in the vicinity of where his body was found was error. The evidence presented at trial regarding this matter was not of sufficient frequency to prove habit. Therefore, the trio's testimony was not admissible to show that Hooker had knowledge of Johnson's nocturnal parking habits. For the above-discussed reasons, I would reverse Hooker's murder conviction and remand this cause to the Coahoma County Circuit Court for a new trial.

**PRATHER, C.J., AND McRAE, J., JOIN THIS OPINION. BANKS, J., JOINS THIS OPINION AS TO PART I.**