LEE, C.J.,
for the Court:
PROCEDURAL HISTORY
¶ 1. Eddie James Pugh IV was convicted by a jury in the Jackson County Circuit Court of Count I, capital murder; Count II, aggravated assault; and Count III, third-degree arson. Pugh was sentenced to serve life for the capital-murder conviction, twenty years for the aggravated-assault conviction, and three years for the third-degree arson conviction. All three sentences were ordered to run consecutively and to be served in the custody of the Mississippi Department of Corrections. Pugh subsequently filed post-trial motions, which the trial court denied.
¶2. Pugh now appeals, asserting the following issues: (1) the indictment was fatally defective; (2) there was insufficient evidence to convict him of third-degree arson; (3) his constitutional right to a speedy trial was violated; (4) the admittance of certain physical evidence violated his constitutional rights; (5) the violation of Uniform Rule of Circuit and County Court 6.03 warrants suppression of all evidence obtained as a result of the violation; (6) the above errors concerning his constitutional rights are not harmless; and (7) cumulative error deprived him of his fundamental right to a fair trial.
FACTS
¶ 3. On October 8, 2008, Elliot Jones was traveling down LaRue Road, located in Jackson County, Mississippi, when he saw a Toyota Sequoia sport-utility vehicle (SUV) by the side of the road with three black males standing behind it. Jones saw one of the men, wearing a white t-shirt, shoot one of the other men. Jones stated he heard two or three shots. Jones also saw a silver Scion at the scene. Jones returned to his home to call 911. At that time, a silver Scion resembling the one Jones had seen at the crime scene turned around in the driveway across from Jones’s house. By the time Jones returned to the crime scene, deputies from the Jackson County Sheriffs Department had arrived.
¶ 4. Deputies Tyrone Nelson and Leo Allen arrived on the scene to find a Toyota Sequoia SUV on fire. Deputy Nelson stopped a silver Scion, similar to the one seen by Jones, driven by Torrenda Whit-more. Whitmore, who was Pugh’s girlfriend, was eventually taken into custody. Deputy Allen observed a person in the back seat of the SUV with his hands bound. The body was later identified as Kelsey McCoy. An autopsy showed McCoy had died from two gunshot wounds to the head. McCoy’s body also showed signs of trauma, including burns on his arms and legs.
¶ 5. During his examination of the crime scene, Deputy Allen received a call for assistance at Costapia Bridge, which was approximately one quarter of a mile from *686 the SUV. Deputy Allen found two men hiding under the bridge. Both men were arrested, one of whom was Pugh. Pugh had a white t-shirt wrapped around his arm. The other man was identified as Barron Borden, who had what appeared to be a gunshot wound to his leg. The record is unclear as to how Borden received the gunshot wound. Lieutenant Curtis Spiers, the narcotics task force commander of Jackson County, was also on the scene and assisted Deputy Allen in securing the two men. Lieutenant Spiers testified Pugh had burns on his hands and smelled like gasoline.
¶ 6. Deputy Joseph Windham was responding to the call on LaRue Road when he saw a passerby pointing towards a ditch. Deputy Windham found Rahman Mogilles lying on the ground. Mogilles had been shot twice, once in the back and once in the buttocks. Mogilles was taken to the hospital for treatment.
¶ 7. Mogilles testified he and McCoy, a friend from college, went to Pugh’s house in New Orleans, Louisiana, on October 8, 2008, in order to buy some marijuana. Mogilles and McCoy were driving Mo-gilles’s Toyota Sequoia SUV. Pugh became suspicious of McCoy, thinking McCoy was a police officer or a corrections officer. Mogilles was sitting outside on Pugh’s patio when he saw Borden walking through the house carrying a small black bag with a baseball bat hanging out. Mogilles testified he was then hit in the back of the head with something and fell to the floor. Pugh dragged Mogilles into the house. Mogilles heard an altercation, then McCoy, who had been waiting in the car, was dragged into the house. Mogilles and McCoy had their hands pulled behind their backs and tied with electrical cord. Mo-gilles and McCoy were then placed in the backseat of Mogilles’s SUV. Mogilles also saw Whitmore at Pugh’s house.
¶ 8. Mogilles testified Pugh drove them towards Mississippi while Borden was in the cargo area holding a gun to McCoy’s head. Mogilles noticed a silver Scion was following them. This same car had been parked at Pugh’s house. Pugh and Whit-more, who was driving the silver Scion, stopped at a Chevron gas station. Mo-gilles noticed Pugh appeared agitated. When Pugh returned to the car, he was holding a-gas can. A receipt dated October 8, 2008, from a Chevron gas station was later found in Whitmore’s purse.
¶ 9. The SUV and the Scion eventually ended up on LaRue Road. Mogilles saw Pugh make a hand gesture in the shape of a gun, then Borden shot McCoy in the head. Mogilles was able to get free from his restraints and attempted to wrestle the gun from Borden. Pugh opened the back of the SUV, and Mogilles and Borden fell out. Mogilles began to run and was shot twice in the back. Mogilles heard someone say, “F — it. He’s dead.” Mogilles was able to get help from a passerby.
¶ 10. Mogilles did admit to lying when the FBI questioned him about the incident. However, Mogilles testified he was scared and decided to tell the truth once he learned Pugh, Borden, and Whitmore were in custody.
¶ 11. There was ballistics evidence linking the gun found near the crime scene to bullet fragments extracted from McCoy and Mogilles. A shoe print from the crime scene matched shoes recovered from Pugh. McCoy’s blood was found inside Pugh’s house and on the SUV. Mogilles’s blood was found on Pugh’s patio.
DISCUSSION
I. INDICTMENT
¶ 12. In his first issue on appeal, Pugh contends the indictment was fatally defective for failing to contain any “aiding *687 and abetting” language. All three counts in the indictment tracked the appropriate statutory language. However, the jury was instructed it could find Pugh had acted “alone or in conjunction” with others. Pugh argues the indictment failed to put him on notice that the State was attempting to prove he acted “alone or in conjunction” with others in committing the offenses charged.
¶ IB. In Brassfield v. State, 905 So.2d 754, 758 (¶ 11) (Miss.Ct.App.2004), this Court held an aiding and abetting instruction was proper even though Brassfield was not indicted for aiding and abetting. We found evidence was presented to show “doubt as to whether Brassfield actually completed the crimes himself, and the aiding and abetting charge served to remind the jury that they could render a guilty verdict regardless of who completed the actual crimes.” Id.; see also Hollins v. State, 799 So.2d 118, 123 (¶ 14) (Miss.Ct.App.2001). Furthermore, the aiding and abetting instruction given in this case is identical to the one approved by the Mississippi Supreme Court in Milano v. State, 790 So.2d 179, 185 (¶ 21) (Miss.2001).
¶ 14. Pugh’s indictment placed him on notice of the charges against him and the facts underlying each charge. See URCCC 7.06. This issue is without merit.
II. ARSON CONVICTION
¶ 15. Pugh next argues the evidence was insufficient to convict him of third-degree arson. The indictment charged Pugh with “set[ting] fire [to] ... the personal property of ... Mogilles, to-wit: a Toyota Sequoia, being of the value of twenty-five dollars or more.... ”
¶ 16. We look to our familiar standard of review in regard to whether the evidence was sufficient to convict. “[T]he critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]’ ” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quotation omitted). If, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that the essential elements of the crime existed, this Court will affirm the conviction. Id. The jury determines the credibility of witnesses and resolves any conflicts in the evidence. Davis v. State, 866 So.2d 1107, 1112 (¶ 17) (Miss.Ct.App.2003).
¶ 17. Mississippi Code Annotated section 97-17-7 (Rev. 2006) states as follows:
Any person who wilfully and maliciously sets fire to or burns or causes to be burned, or who aids, counsels or procures the burning of any personal property of whatsoever class or character; (such property being of the value of twenty-five dollars and the property of another person), shall be guilty of arson in the third degree and upon conviction thereof, be sentenced to the penitentiary for not less than one nor more than three years.
Pugh argues the State failed to prove the value of Mogilles’s SUV was twenty-five dollars or more. While the State did not offer an appraisal of the SUV, Mogilles testified he regularly maintained his SUV, and the SUV was “pretty much flawless.” Pictures of the SUV were admitted into evidence. Given the condition of the SUV prior to being set on fire and viewing this evidence in the light most favorable to the State, we find the jury could have reasonably inferred that the value of the SUV was twenty-five dollars or more. See Wilson v. State, 815 So.2d 439, 441 (¶ 4) (Miss.Ct.App.2002). This issue is without merit.
*688 III. CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL
¶ 18. In his next issue on appeal, Pugh contends his constitutional right to a speedy trial was violated. Since there is no set amount of time within which a defendant must be brought to trial, the United States Supreme Court has developed a balancing test to determine whether a defendant’s constitutional right to a speedy trial has been violated. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The four factors to be considered together and balanced are: (1) the length of delay, (2) the reason for the delay, (3) the defendant’s assertion of his right, and (4) prejudice to the defendant. Id at 530-32, 92 S.Ct. 2182; Stark v. State, 911 So.2d 447, 450 (¶ 7) (Miss.2005).
A. Length of the delay
¶ 19. Under Barker, “[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.” Barker, 407 U.S. at 530, 92 S.Ct. 2182. In Mississippi, any delay from the date of arrest, indictment, or information until trial exceeding eight months is presumptively prejudicial. Stark, 911 So.2d at 449-50 (¶ 7) (citing Smith v. State, 550 So.2d 406, 408 (Miss.1989)). Pugh was arrested on October 8, 2008, and his trial finally began on October 18, 2010. Since the delay exceeds eight months, it is presumptively prejudicial, and the cause of the delay must be analyzed under the remaining Barker factors.
B. Reason for the delay
¶ 20. “Once a delay is found to be presumptively prejudicial, the burden of proof shifts to the State to show cause for the delay.” Stark, 911 So.2d at 450 (¶ 11). The appellate court must determine whether the delay should be charged to the State or the defendant. Id. Since the burden is on the State to provide a defendant with a speedy trial, this factor is weighed against the State unless it can show either that the delay was caused by the defendant or that the delay was for a good cause. Id; Wiley v. State, 582 So.2d 1008, 101
¶ 21. Pugh was arrested by federal authorities on October 14, 2008; indicted on federal charges on November 6, 2008; and convicted in federal court on May 15, 2009. After receiving the transcripts from the federal prosecution, the State presented Pugh’s case to the grand jury on August 20, 2009. Pugh was indicted by a Jackson County grand jury on September 10, 2009. We find the first delay, from October 14, 2008, until May 15, 2009, was the result of the federal investigation and prosecution. This delay should not weigh heavily against the State.
¶ 22. Pugh’s trial date was originally set for February 1, 2010; however, the trial court was advised that Pugh’s trial counsel was not fully prepared for trial and continued the case until April 12, 2010. Pugh purportedly objected to this continuance. On March 12, 2010, Pugh’s trial counsel filed a motion for continuance, and trial was set for July 26, 2010. On June 25, 2010, Pugh’s trial counsel made an ore tenus motion for continuance waiving all constitutional and statutory rights to a speedy trial during the period of continuance. The trial was continued until October 18, 2010.
¶ 23. “Well-taken” motions for continuance may justify a delay in a criminal case. Flora v. State, 925 So.2d 797, 815 (¶ 63) (Miss.2006). We find the majority of the delay during this time was the result of continuances sought by Pugh’s *689 trial counsel. This delay does not weigh against the State. Although the state prosecution of Pugh was delayed by the federal prosecution, Pugh also delayed the case by requesting continuances. Thus, we find this factor to be neutral.
C. Assertion of the right to speedy trial,
¶ 24. Pugh first asserted his right to a speedy trial on October 5, 2009, approximately one month after being indicted. Pugh also asserted his right to a speedy trial in a pro se motion filed on December 7, 2009. Finding Pugh did assert his right to a speedy trial, we find this favor weighs in Pugh’s favor.
D. Prejudice to the defendant
¶ 25. The supreme court has identified three main considerations in determining whether the accused has been prejudiced by a lengthy delay: “(1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired.” Jefferson v. State, 818 So.2d 1099, 1108 (¶ 21) (Miss.2002) (internal quotations omitted). “Generally, proof of prejudice entails the loss of evidence, death of witnesses, or staleness of an investigation.” Sharp v. State, 786 So.2d 372, 381 (¶ 19) (Miss.2001).
¶ 26. Pugh contends while being prosecuted by the federal government, the prospect of prosecution by the State and the possibility of receiving the death penalty caused anxiety. However, “anxiety alone does not amount to prejudice worthy of reversal.” Duplantis v. State, 708 So.2d 1327, 1336 (¶ 25) (Miss.1998). Pugh does not contend that his defense was impaired or that his pretrial incarceration was oppressive. This factor weighs against Pugh.
¶ 27. While not considering lightly that a delay did exist, we recognize some of the delay was attributable to Pugh, and Pugh has failed to show any actual prejudice as a result of the delay. Thus, we cannot find that Pugh’s constitutional right to a speedy trial was violated. This issue is without merit.
IV. ADMITTANCE OF PHYSICAL EVIDENCE
¶ 28. In his next issue on appeal, Pugh argues the trial court erred in allowing the State to admit physical evidence obtained in violation of his constitutional rights. On October 11, 2008, three days after he was arrested, Pugh made certain statements to law enforcement officers concerning his involvement in the crime. During a suppression hearing, the trial court determined these statements made by Pugh were inadmissible and involuntary. However, the physical evidence to which Pugh had directed the officers was deemed admissible under the inevitable-discovery doctrine. Pugh had shown the officers where the gun, cell phone, and SUV keys were located. The gun was found approximately two hundred feet from the SUV, and the cell phone and keys were found approximately fifty feet from the SUV.
¶ 29. Under the inevitable-discovery doctrine, the results of an unreasonable search will be admissible if it can be shown that this evidence would have ultimately been discovered by constitutionally permissible means. Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In order for the evidence to be admitted, the State must prove the following: “(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the *690 misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation.” United States v. Cherry, 759 F.2d 1196, 1204 (5th Cir.1985) (citing United States v. Brookins, 614 F.2d 1037, 1042 n. 2 (5th Cir.1980)).
¶ 30. According to the testimony, the police had already commenced a search of the area prior to Pugh’s statement on October 11. Personnel from four different agencies, search dogs, and a dive team had been dispatched to the area to find the gun. Two members of the search team testified finding the gun was a priority, and the search would continue until the gun was found. There was testimony that the searchers were able to narrow the search area due to where the SUV was found and where Pugh was arrested. According to the record, Pugh did not take the searchers directly to the gun. Rather, Pugh could not remember exactly where he threw the gun and pointed in a general direction. There was testimony that finding the gun was a public safety issue. We cannot find the trial court erred in deciding to admit the physical evidence under the inevitable-discovery doctrine. This issue is without merit.
V.RULE 6.03
¶ 31. Pugh argues the State’s violation of Uniform Rule of Circuit and County Court 6.03 infringed upon his constitutional rights. Pugh contends that had Rule 6.03 been followed, he would have been afforded counsel and never led the authorities to the evidence. Rule 6.03 provides “every person in custody shall be taken, without unnecessary delay and within 48 hours of arrest, before a judicial officer ... for an initial appearance.” Pugh was arrested on October 8, 2008, and provided an initial appearance on October 13, 2008. The Mississippi Supreme Court has held that “failure to follow the exact procedure of Rule 6.03 does not necessarily result in a Fourth Amendment violation.” Lawrence v. State, 869 So.2d 353, 356 (¶ 12) (Miss.2003); see also Jones v. State, 841 So.2d 115, 132 (¶ 47) (Miss.2003).
¶ 32. Pugh relies upon Abram, v. State, 606 So.2d 1015 (Miss.1992) (overruled on other grounds), to support his argument. In Abram, the Mississippi Supreme Court reversed, finding defendant Abram would not have confessed had he been given a timely initial appearance and access to counsel. Id. at 1029. However, Abram’s confession was not suppressed and was the only evidence presented during trial to support his conviction. Id. Pugh’s case is distinguishable because his confession was suppressed, and there was overwhelming evidence of his guilt, including testimony from an eyewitness and other physical evidence. Furthermore, as we have determined the evidence found as a result of Pugh’s confession was admissible under the inevitable discovery doctrine, we cannot find this evidence should be excluded due to Pugh’s untimely initial appearance. This issue is without merit.
VI. VIOLATIONS OF PUGH’S FUNDAMENTAL RIGHTS
¶ 33. Pugh contends the multiple violations of his fundamental right to a fair trial contributed to his conviction; thus, any of these errors cannot be considered harmless. However, we have found no violation of Pugh’s fundamental right to a fair trial. This issue is without merit.
VII. CUMULATIVE ERROR
¶ 34. In his final issue on appeal, Pugh contends the cumulative effect of individual errors requires reversal. Finding Pugh’s arguments to be without merit, we find no cumulative error that would necessitate reversal. Therefore, we affirm.
*691 ¶ 35. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, CAPITAL MURDER, AND SENTENCE OF LIFE WITHOUT PAROLE; COUNT II, AGGRAVATED ASSAULT, AND SENTENCE OF TWENTY YEARS; AND COUNT III, THIRD-DEGREE ARSON, AND SENTENCE OF THREE YEARS, WITH ALL SENTENCES TO BE SERVED CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY.