# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01270-COA

**DUSTIN MICHAEL GRAY A/K/A DUSTIN M. GRAY**  <span style="float:right">**APPELLANT**</span>

**v.**

**STATE OF MISSISSIPPI**  <span style="float:right">**APPELLEE**</span>

| | |
|---|---|
| DATE OF JUDGMENT: | 10/02/2023 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: STACY L. FERRARO JOSEPH SCOTT HEMLEBEN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 02/05/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Dustin Gray was convicted of capital murder and sentenced to life imprisonment without eligibility for parole for his role in the robbery and killing of his friend Willie Jones. On appeal, Gray argues that the trial court erred by not suppressing his second statement to law enforcement and other "derivative evidence that was the fruit of the poisonous tree," i.e., his first statement to law enforcement, which the trial court had suppressed prior to trial. Gray also argues that the trial court erred by denying his motion for a judgment

notwithstanding the verdict (JNOV); that the trial court erred by giving a "flight instruction" to the jury; that his right to an impartial jury was violated by the presence of two alternate jurors, although both were dismissed prior to the beginning of deliberations; and that the trial court erred by imposing an excessive fine and assessment.

¶2.    The trial court did not clearly err by finding that Gray's second statement was voluntary or by denying his motion in limine to exclude other evidence. In addition, the evidence was legally sufficient to sustain Gray's conviction, so the trial court did not err by denying his JNOV motion. Gray did not object to the "flight instruction," so that issue is procedurally barred on appeal. And the trial court committed no error, and Gray can show no prejudice, related to either alternate juror. Therefore, we affirm Gray's conviction. However, the State offers no authority for the trial court's imposition of a $10,000 assessment as partial reimbursement to the county for Gray's court-appointed counsel. Therefore, we reverse in part and render that assessment void. Gray's sentence is affirmed except for the "assessment."

## FACTS AND PROCEDURAL HISTORY

¶3.    On the evening of July 5, 2020, Willie Jones, his cousin Dakeyvion, Dustin Gray, and Gray's brother Austin Brookshire were at Dakeyvion's house in Picayune. Willie was counting a "large sum of money" ("20s" and "100s") in Gray's presence. Willie sold drugs and often had large amounts of cash, which he kept in a shoe box.[1] Austin left the house sometime that evening. Later, Gray and Willie left Dakeyvion's house together. Gray was

---

[1] Gray also sold drugs and was at Dakeyvion's house to sell drugs.

supposed to give Willie a ride home. Willie was never seen alive again.

¶4. On July 6, Gray took his car to a detail shop. However, an employee of the shop, Willie McCormick, refused to clean the car because he could see blood stains in the back seat and shell casings in the front seat on the passenger side. Gray then offered McCormick "a wad of money" to clean the car, but McCormick again refused. After McCormick refused to clean the car, Austin called his (and Gray's) brother Andrew Brookshire, who lived with their sister Amber Brookshire. Austin asked Andrew if they could leave Gray's car at Amber's house, and Andrew agreed. Gray and Austin told Andrew that they needed a new back seat for the car, and Gray gave Andrew $500 to buy a new back seat.

¶5. On July 6, Willie's relatives reported him missing and told police that Gray was the last person seen with Willie. On July 7, Detective Rhonda Johnson of the Picayune Police Department interviewed Gray at his house. Gray appeared nervous and denied that Willie left Dakeyvion's house with him. Gray stated that he had agreed to give Willie a ride home, but Willie changed his mind and was still at Dakeyvion's house when he (Gray) departed. Gray stated that as he was leaving Dakeyvion's house, another car drove up, but he did not know who was in the car. Gray denied any knowledge about Willie's disappearance.

¶6. On July 8, Johnson learned about Gray's unsuccessful attempt to get his car cleaned at the detail shop. McCormick identified Gray as the man who brought in the car and told Johnson about the blood and shell casings. Johnson obtained a search warrant for Gray's house, and law enforcement found what they believed to be a stolen firearm. Law enforcement then obtained an arrest warrant for Gray for possession of a stolen firearm.

3

However, Gray and his wife, Erica, had already fled the State.

¶7. On July 9, Gray's sister Amber looked inside Gray's car, which was still parked at her house. Amber saw "a bullet hole in the back seat and blood" and immediately called 911. Testing later confirmed the presence of blood on the back seat. Inside the car, law enforcement also found shell casings, a projectile, and an earring like one Willie wore.

¶8. A few days later, Austin and Andrew met in Rankin County. Austin admitted that Gray "told him to shoot [Willie], and he did." Austin also told Andrew where and how he and Gray had buried Willie's body.

¶9. On July 15, Gray was arrested in Pueblo, Colorado, for possession of a stolen firearm. Law enforcement found just under $18,000 in the car Gray had been driving.

¶10. Austin and Andrew met again after Gray was arrested. Austin "was worried." He gave Andrew approximately $16,000 and said "to get him a lawyer" if he (Austin) was arrested. Andrew hid the money but later turned it over to law enforcement after he (Andrew) was arrested.

¶11. On July 17, Detective Johnson interviewed Gray in Colorado. Gray waived his *Miranda*[2] rights and agreed to talk to Johnson. The interview was recorded. Gray eventually confessed that Austin shot and killed Willie while Willie was in the back seat of Gray's car. Gray stated that Austin took Willie's shoe box full of cash and promised to give Gray $20,000 later. Gray also told Johnson how and where he and Austin buried Willie's body. Prior to trial, the trial court granted Gray's motion to suppress his July 17 confession, so that

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

confession was not admitted into evidence at trial.

¶12. Detective Richard Gulledge of the Pearl River County Sheriff's Department testified that he interviewed Austin on July 19 and 20. Austin admitted that he and Gray had planned to rob and kill Willie. Austin stated that he pulled the trigger and shot Willie at Gray's direction.[3] Detective Johnson also testified she "was told" that Austin killed Willie in Gray's car while Gray was present.[4] Austin also told Gulledge that he and Gray had purchased a shovel and tarp at Lowe's in Slidell, Louisiana, and used those items to bury Willie's body in Pearl River County. Austin stated that he and Gray discarded the shovels off Highway 607, and law enforcement found the shovels in the location Austin had described.

¶13. Gray waived extradition and was transported back to Mississippi. On August 2, Gray again waived his *Miranda* rights and gave a statement to Detective Gulledge. Gray admitted that Austin told him before Willie got in the car with them that he was going to shoot Willie and rob him. Gray claimed that he did not plan or want to kill Willie, and "for [him], if anything, it was a robbery, not a murder." Gray admitted that he and Austin "obviously" planned to rob Willie, but he also claimed that he "really did not want to rob [Willie]." Gray stated that Willie left his shoe box full of money in Willie's car at Dakeyvion's house before they left. After Austin shot Willie, Austin searched Willie's pockets and took his keys. Gray and Austin later drove back to Dakeyvion's house and used Willie's keys to retrieve Willie's

---

[3] The trial court ruled that Gray "open[ed] the door" to Gulledge's testimony on redirect examination by cross-examining Gulledge about other parts of Austin's statement. Gray does not challenge that ruling on appeal.

[4] Gray elicited Johnson's testimony on cross-examination, which she then clarified, without objection, on redirect examination.

money from Willie's car. Gray and Austin then drove to Gray's house, where they counted and divided Willie's money. Later, they went to bury Willie.

¶14. Consistent with Gray's and Austin's confessions and Austin's statements to Andrew, Willie's body was recovered in a shallow grave in an isolated area on hunting club property in Pearl River County. Gray admitted that he and Austin bought shovels and a tarp at the Lowe's in Slidell to use to dispose of Willie's body. In addition, Andrew testified that Austin told him about buying the shovels and tarp at Lowe's. A Lowe's surveillance video of Austin and Gray buying those items was admitted into evidence at trial.

¶15. Dr. Mark LeVaughn performed the autopsy and determined that Willie died of multiple gunshot wounds to the chest. Projectiles recovered from Willie's body were analyzed and compared to the projectile found in Gray's car. Forensic scientist Lori Beall testified that all three projectiles bore similarities in class characteristics with .223-caliber ammunition, but because they were damaged and misshapen, they could not be positively included or excluded as having been fired by the same gun. Evidence showed that Austin purchased a Sig Sauer SIGM400 5.56mm rifle two months before Willie was killed. Beall testified that it was possible to shoot .223-caliber ammunition through that type of rifle.

¶16. Gray and Austin were indicted for capital murder, and Erica and Andrew were indicted for accessory after the fact to capital murder. Gray's and Austin's cases were later severed, and they were tried separately.[5]

---

[5] Austin was convicted of first-degree murder. This Court recently affirmed his conviction on direct appeal. *Brookshire v. State*, No. 2023-KA-00966-COA, 2025 WL 2601213 (Miss. Ct. App. Sept. 9, 2025) (motion for rehearing denied January 20, 2026).

6

¶17. Prior to trial, Gray filed a motion to suppress his July 17, 2020 statement to Detective Johnson (the Colorado confession). Gray also sought to suppress his August 2, 2020 statement to Detective Gulledge (the Mississippi confession), as well as Austin's and Andrew's statements to law enforcement, the video recordings from the Lowe's in Slidell, all evidence related to the discovery of Willie's body, and other "derivative evidence." Following a pretrial suppression hearing, the trial court granted Gray's motion to suppress his Colorado confession; however, the trial court's ruling did not address Gray's Mississippi confession or any other evidence. Gray subsequently filed a motion in limine in which he again sought to exclude the Mississippi confession and other "derivative evidence," arguing that the Mississippi confession was predicated on information obtained during his Colorado confession and that other evidence was "fruit" of the unlawfully obtained Colorado confession. The trial court denied Gray's motion in limine, finding that the Mississippi confession was voluntary and not tainted by the Colorado confession and that other evidence would have been discovered by law enforcement regardless of the Colorado confession.

¶18. In August 2023, a four-day jury trial was held. The State's theory of the case was that Gray and Austin had planned to rob Willie, and Austin shot Willie in Gray's car while Gray was driving. Andrew testified, without objection, that Austin stated that Gray had instructed him in a text message to kill Willie. However, law enforcement never recovered Gray's and Austin's phones because the phones had been discarded, and law enforcement could not access the data on their iCloud accounts. The jury found Gray guilty of capital murder, and the court sentenced him to life imprisonment in the custody of the Department of Corrections

without eligibility for parole. Gray filed a motion for JNOV or a new trial, which was denied, and a notice of appeal.

¶19. On appeal, Gray argues (1) that the trial court erred by not suppressing his Mississippi confession and other "derivative evidence that was the fruit of the poisonous tree," i.e., his Colorado confession; (2) that the trial court erred by denying his motion for JNOV; (3) that the trial court erred by giving a "flight instruction"; (4) that his right to an impartial jury was violated; and (5) that the trial court erred by imposing an excessive fine and assessment.

## ANALYSIS

I.  **The trial court did not err by admitting Gray's Mississippi confession or other inculpatory evidence.**

A.  **The trial court did not err by admitting the Mississippi confession.**

¶20. The trial court suppressed Gray's July 17, 2020 statement to Detective Rhonda Johnson (the Colorado confession) on two grounds: (1) because Johnson did not "seek clarification" of Gray's supposed "ambiguous request for counsel" and (2) because it was the product of "coercive tactics" by Johnson and "was not voluntary." Although Gray's Colorado confession was suppressed and is not directly at issue in this appeal, it is important to understand the grounds on which it was suppressed because that impacts our analysis of Gray's arguments that his August 2, 2020 statement to Detective Richard Gulledge (the Mississippi confession) should have been suppressed as well.

¶21. The trial court clearly misapplied the law when ruling that the Colorado confession was inadmissible because Johnson did not "seek clarification" of Gray's supposed

8

"ambiguous request for counsel." The trial court cited *Holland v. State*, 587 So. 2d 848, 856 (Miss. 1991), and *Downey v. State*, 144 So. 3d 146, 150-52 (¶¶7-13) (Miss. 2014), for the proposition that when a suspect makes an ambiguous request for counsel, the interrogation must cease except for questions intended to clarify the ambiguous request. However, the Mississippi Supreme Court has overruled *Holland* and *Downey* to the extent they *required* an officer to seek clarification of an ambiguous request for counsel. *Saddler v. State*, 297 So. 3d 234, 239 (¶13) (Miss. 2020). In a series of cases, the Court has "held that Mississippi does *not* require the officer to ask clarifying questions after ambiguous utterances" and "that such clarifying questions are *not* required." *Id.* (emphasis added). Rather, unless the suspect makes "an *unambiguous*, *unequivocal* request for an attorney," "the officer ha[s] no obligation to stop questioning [him]." *Id.* (emphasis added) (brackets omitted). Mere "ambiguous" statements are insufficient to invoke a suspect's right to counsel. Here, the trial court clearly misstated the law by holding that Gray's "ambiguous" comments triggered his right to counsel or required "clarifying" questions. Moreover, the record clearly shows that Gray never *unambiguously* requested a lawyer during the Colorado interview.[6] Therefore, the trial court clearly erred by suppressing Gray's Colorado confession on this ground.

---

[6] To the contrary, Gray stated at one point that he was "think[ing] of a lawyer." Later, he stated, "My dad is a lawyer, and I've seen these things happen. People get f***ed without a lawyer. If a lawyer is sitting right here and we come up with an agreement, that's one thing." Detective Johnson immediately interjected, "I mean, you signed the paper saying you would talk without a lawyer. What are you saying now?" Gray then stated, "Yes, I am, I'm talking to you." Johnson stated, "Okay, I was just making sure that you didn't change your mind." Gray stated, "No, no, I'm still talking." Thus, Johnson actually *did* clarify Gray's ambiguous comments, and Gray made clear that he *did* want to continue talking.

9

¶22. On appeal, the State does not challenge the trial court's alternative finding that Gray's Colorado confession was coerced and "not voluntary." Therefore, we accept that finding for purposes of this appeal. But it does not follow that Gray's subsequent Mississippi confession should have been suppressed as well. The United States Supreme Court has explained that

> after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. *But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.*

*United States v. Bayer*, 331 U.S. 532, 540-41 (1947) (emphasis added). "The admissibility of the later confession depends upon the same test [as the former]—is it voluntary." *Lyons v. Oklahoma*, 322 U.S. 596, 603 (1944). "When a prior statement is actually coerced, [1] the time that passes between confessions, [2] the change in place of interrogations, and [3] the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Oregon v. Elstad*, 470 U.S. 298, 310 (1985).

¶23. Here, sixteen days passed between the Colorado confession and the Mississippi confession. In addition, the latter confession was made in an entirely different "place" than the former—after Gray had waived extradition and returned to Mississippi. Finally, there was a "change in the identity of the interrogators." Prior to the Mississippi confession, Detective Gulledge thoroughly advised Gray of his *Miranda* rights, and Gray voluntarily waived his rights and agreed to talk to Gulledge. Moreover, as the trial court found, "Gulledge did not use coercive tactics or improperly induce statements from Gray" during

10

the Mississippi interview. Under these circumstances, the trial court found that the Mississippi confession was voluntary and admissible.

¶24. The trial court's finding is consistent with *Keller v. State*, 138 So. 3d 817 (Miss. 2014), in which the Mississippi Supreme Court affirmed the trial court's finding that the defendant's third confession was voluntary and admissible even though it followed two involuntary and inadmissible confessions. *Id.* at 852 (¶¶80-82). In *Keller*, the defendant sustained a gunshot wound and was taken to the emergency room following his arrest. *Id.* at 847 (¶63). The trial court held that the defendant's first two confessions were involuntary and inadmissible because he was questioned while still receiving treatment in the emergency room, and he was disoriented and in a great deal of pain and distress. *Id.* at (¶64). However, the following afternoon (fourteen hours later), the defendant waived his *Miranda* rights and agreed to talk to the same officer who had conducted the second interview. *Id.* at 847-48, 852 (¶¶65, 81). The trial court found that the third interview was conducted "away from the chaos of the emergency room," the defendant "gave no indication of [any] pain or distress," the officer did not employ any coercive tactics, and the defendant gave a detailed confession. *Id.* at 852 (¶81). Under those circumstances, the trial court found that the defendant's third confession was voluntary and admissible even though it followed two prior involuntary confessions. *Id.* The Supreme Court affirmed, holding that the trial court applied the correct legal standard and that its findings of fact were not clearly erroneous. *Id.* at (¶82).

¶25. Likewise, in the present case, we cannot say that the trial court clearly erred by finding that Gray's second confession was voluntary and admissible. *See, e.g., Alexander v. State*,

11

610 So. 2d 320, 326 (Miss. 1992) (holding that the trial court's finding that a confession was voluntary will not be reversed unless it is clearly erroneous). Therefore, the trial court did not err by denying Gray's motion to suppress the Mississippi confession.

¶26. In the alternative, for the sake of completeness, we would also hold that any error in the admission of the Mississippi confession was harmless in light of the overwhelming evidence of Gray's guilt. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (holding that the erroneous admission of a confession is subject to harmless-error analysis).

¶27. Gray was the last person seen with Willie. The day after Willie disappeared, Gray took his car to a detail shop in an effort to clean up the evidence of the crime, but the detail shop employee rebuffed Gray and the "wad of money" he offered. Gray then took the car to his sister's house, but a few days later his sister saw a bullet hole and blood in the back seat of the car and immediately called 911. In addition to confirming the presence of blood, law enforcement recovered shell casings, a projectile, and an earring like one that Willie wore from the car. After Gray fled to Colorado, his brothers Austin and Andrew made statements to police implicating him in the robbery and murder. Law enforcement also recovered large sums of cash from Andrew and Gray. Surveillance video showed Austin and Gray buying shovels and a tarp to bury Willie's body, and Willie's body was recovered in a shallow grave in rural Pearl River County. The Lowe's surveillance video and the location of the body were consistent with Austin's and Andrew's statements to police. The characteristics of the projectiles recovered from Willie's body were consistent with having been fired from a rifle that Austin purchased two months before the murder.

¶28. In light of all the evidence against Gray, any error in the admission of his Mississippi confession was harmless beyond a reasonable doubt. *See Fulminante*, 499 U.S. at 310 ("When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt."). Indeed, this Court recently held that the trial court erred by denying Austin's motion to suppress his confession prior to his separate trial, but we also held that the error was "harmless" "[i]n light of the overwhelming evidence against [Austin]." *Brookshire*, 2025 WL 2601213, at *5 (¶22). Accordingly, this Court unanimously affirmed Austin's murder conviction.[7] The evidence against Gray was no less "overwhelming" than the evidence against Austin.[8] Therefore, even if we concluded that Gray's Mississippi confession was admitted in error, we would hold that the error was harmless. *See State ex rel. Moore v. Molpus*, 578 So. 2d 624, 634 (Miss. 1991) ("[L]ike cases ought to be decided alike.").

### B. The trial court did not err by admitting any other alleged "derivative evidence."

¶29. In addition, the trial court did not err by denying Gray's motion to suppress other evidence obtained during the course of the investigation. This evidence includes Austin's

---

[7] Presiding Judge Carlton and Judge McCarty concurred in result only without separate written opinion.

[8] The evidence in both trials showed that Austin was the shooter. However, "[t]o find [Gray] guilty of capital murder, the jury did not need to find he was the shooter." *Dampier v. State*, 973 So. 2d 221, 231 (¶28) (Miss. 2008). "Thus, it is largely irrelevant who did the shooting." *Randall v. State*, 716 So. 2d 584, 590 (¶32) (Miss. 1998).

and Andrew's statements to law enforcement, information regarding Austin's purchase of the murder weapon, evidence from Lowe's in Slidell, evidence from Highway 607, and evidence related to the discovery of Willie's body.

¶30.   As stated above, the trial court found that Gray's Colorado confession "was not voluntary due to several statements law enforcement made during the interrogation which were, individually and/or cumulatively, coercive in inducing Gray's eventual statement." It is well-settled that "an involuntary confession [is] inadmissible for any purpose whatsoever." *Booker v. State*, 326 So. 2d 791, 793 (Miss. 1976).  Therefore, the trial court's finding (unchallenged on appeal) required the exclusion of Gray's Colorado confession.  In addition, precedent "requires the exclusion of the physical fruit of actually coerced statements." *United States v. Patane*, 542 U.S. 630, 644 (2004) (plurality opinion).[9]  "However, all evidence obtained by virtue of illegal actions of the police is *not* 'fruit of the poisonous tree.'" *Hooker v. State*, 716 So. 2d 1104, 1112 (¶28) (Miss. 1998) (emphasis added).  "[T]he derivative evidence analysis ensures that the prosecution is not put in a worse position simply because of some earlier police error or misconduct."  *Nix v. Williams*, 467 U.S. 431, 443 (1984).  Therefore, any "evidence that has been discovered by means wholly independent of any constitutional violation" remains admissible.  *Id.*  In addition, evidence is admissible despite the constitutional violation "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  *Id.* at 444.

---

[9] In contrast, the physical fruits of an "unwarned" but otherwise *voluntary* statement need not be suppressed.  *Id.* at 634.

14

¶31. In its order denying Gray's motion in limine, the trial court emphasized that even before Gray's Colorado confession, law enforcement already had identified Austin and Andrew as suspects and had discovered Gray's car, the incriminating evidence in the car, and Gray's efforts to destroy that evidence. Austin and Andrew later gave statements that pointed law enforcement to the same evidence that Gray disclosed in his Colorado confession. Therefore, the trial court found that the evidence inevitably would have been discovered even without Gray's Colorado confession. We cannot say that the trial court clearly erred by finding that the additional evidence Gray sought to suppress would have been discovered inevitably even without Gray's Colorado confession. Accordingly, the trial court did not err by denying Gray's motion in limine.

## II. The trial court did not err by denying Gray's motion for judgment notwithstanding the verdict.

¶32. We review the denial of a JNOV motion de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). "We view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime." *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and emphasis omitted). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20). "Rather, we must affirm the conviction as long as there is sufficient evidence for a

rational juror to find that the State proved all elements of the offense." *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶33.    To convict Gray of capital murder, the State was required to prove beyond a reasonable doubt that Willie was killed "without authority of law" and "with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2020).  To find Gray guilty of capital murder, the jury was not required to find that Gray shot Willie or contemplated that Willie would be killed, but only that he aided and abetted Austin in the robbery.  *Dampier*, 973 So. 2d at 231 (¶28).[10] In addition, "Mississippi follows the 'one-continuous-transaction' rule for determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder."  *Beasley v. State*, 362 So. 3d 112, 122 (¶33) (Miss. Ct. App. 2023) (quoting *Gillett v. State*, 56 So. 3d 469, 492 (¶50) (Miss. 2010)).  The Mississippi Supreme Court has explained that

> [w]here the two crimes [e.g., murder and robbery] are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained.  Regarding the underlying felony of robbery, if the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events, the fact that the victim was dead when he took the property cannot absolve the defendant from the crime of robbery.  The State need not prove the defendant had the intent to rob prior to the killing. Rather, the State has the burden to prove that the two crimes are connected in a chain of events and occur as part of the res gestae.

---

[10] "While it is true that a defendant involved in an armed robbery in which a killing occurs but who did not do the actual killing must have at least contemplated the use of lethal force before the death penalty may be imposed, no such contemplation or intent is required to be found in the guilt phase of the trial."  *Ballenger v. State*, 667 So. 2d 1242, 1254 (Miss. 1995).

*Batiste v. State*, 121 So. 3d 808, 831-32 (¶33) (Miss. 2013) (citations, brackets, and quotation marks omitted).

¶34. Robbery is the taking of personal property from the victim's "presence or . . . person . . . against his will, by violence to his person or by putting [him] in fear of some immediate injury to his person." Miss. Code Ann. § 97-3-73 (Rev. 2020). "[T]he phrase 'from the presence' or 'in the presence' has been construed in a number of cases." *Reynolds v. State*, 227 So. 3d 428, 437 (¶35) (Miss. Ct. App. 2017) (quoting *Towner v. State*, 812 So. 2d 1109, 1113 (¶19) (Miss. Ct. App. 2002)). "*'Presence' in this connection is not so much a matter of eyesight as it is one of proximity and control: the property taken in the robbery must be close enough to the victim and sufficiently under his control that, had the latter not been subjected to violence or intimidation by the robber, he could have prevented the taking.*" *Id.* (quoting *Towner*, 812 So. 2d at 1113 (¶19)).

¶35. Here, prior to the murder, Gray and others observed Willie counting a large amount of cash. In Colorado, $18,000 was found in the console and trunk of the car Gray was driving. In addition, Andrew testified that a few days after Gray was arrested, Austin gave him $16,000 to hide. Austin told Andrew that the money came from Willie.

¶36. Gray argues the State did not prove robbery and only proved, at most, that Austin and Gray took the money out of Willie's car after they had already killed Willie in Gray's car. However, the evidence contradicts this claim, showing both Gray and Austin intended to rob Willie before they killed him. Moreover, according to Gray's own confession, Austin shot Willie and then searched Willie's pockets and took his keys from his person. Austin then

17

used those keys to open Willie's car and take his money.

¶37. We must view the evidence in the light most favorable to the prosecution, and we must affirm the conviction if a rational juror could have found that the State proved each essential element of the offense beyond a reasonable doubt. *Poole*, 46 So. 3d at 293 (¶20). Applying the one-continuous-transaction rule, there was sufficient evidence for a rational juror to find beyond a reasonable doubt that Willie was killed as part of the same continuous chain of events as the robbery. "[T]he jury properly was instructed on the one-continuous-transaction rule" and "was able to determine whether the killing and the robbery had occurred as part of a continuous chain of events." *Batiste*, 121 So. 3d at 833 (¶35). Accordingly, the trial court did not err by denying Gray's motion for JNOV.

### III.    Gray waived any objection to the jury instruction regarding flight.

¶38. Gray next argues that the trial court erred by giving a jury instruction regarding his "flight" to Colorado following Willie's murder. "However, [Gray] failed to object to the jury instruction offered by the State at trial. [The Mississippi Supreme] Court has held on numerous occasions that an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal." *Jones v. State*, 776 So. 2d 643, 653 (¶35) (Miss. 2000). Therefore, the issue is procedurally barred.

### IV.    Gray's right to an impartial jury was not violated.

#### A.    Juror Mendoza

¶39. Prior to opening statements, one of the alternate jurors, juror Mendoza, told the court that she "came back from lunch . . . not feeling good" and "very nervous" and wanted "to be

18

excused" because she did not think she could "make it through the trial." The court asked Mendoza if she would "at least try to stay through the opening" statements but that he would "excuse" her if she still felt the same following opening statements. Mendoza agreed. Following opening statements, Mendoza informed the court that she could not make it through trial and needed to be excused. The court excused Mendoza, stating that she was "having anxiety attacks" and could not "take it." The court informed the remaining jurors that Mendoza had been excused because of "material issues that she had to leave for." The defense did not object to the dismissal of the alternate juror or move for a mistrial. Indeed, defense counsel agreed that it was appropriate to dismiss Mendoza.

¶40. On appeal, Gray argues that Mendoza's dismissal or the circumstances of it somehow prejudiced him, asserting, without elaboration, that Mendoza's "fear" "was likely observed by the jury and created bias." He asserts that the other jurors should have been "questioned about Juror Mendoza's departure." However, Gray waived the issue by failing to object, move for a mistrial, or request any other action by the trial court. *Cf. Smith v. State*, 729 So. 2d 1191, 1200 (¶32) (Miss. 1998) (holding that the defendant waived any objection to the dismissal of a prospective juror because "he did not object when the trial court actually dismissed her"). Moreover, we fail to see how Mendoza's dismissal prejudiced Gray in any way. Accordingly, this issue is without merit.

### B. Juror Burge

¶41. Five weeks after the trial, Gray filed a "Motion for Mistrial" in which he alleged that the other alternate juror, Adriona Burge, had failed to disclose her prior knowledge of the

19

case during voir dire. Notably, Burge had been excused prior to the beginning of the jury's deliberations because no alternate juror was needed. In Gray's post-trial motion, he alleged:

> Upon information and belief, Adriona Burge . . . was married to Randolph Burge, and they were co-owners of a mortuary transport business. . . . [After Willie's body was discovered, the county] coroner called Randolph Burge to come and transport [Willie's] body . . . to [Randolph Burge's] cold storage facility that was located in a shed behind [the Burges'] home . . . . Adriona Burge was at her house when the body arrived. Pearl River County deputies escorted the transport of Willie's body, and were at the home of Adriona Burge when the body was transported to the cold storage facility behind her house. She saw the body and spoke with the Pearl River County deputies who were escorting the transport.

Gray asserted that Randolph Burge had informed Gray's father of this information sometime "after the jury verdict was made public." Gray did not provide an affidavit from Adriona Burge or anyone else or any other evidence to corroborate his allegation.

¶42. Gray asserted that Adriona Burge should have responded during voir dire when defense counsel asked, "I need to know if any of you have any kind of job that would -- that might affect your ability to serve as a juror in this case. For example, if you work in the law enforcement or medical field *or funeral home*. Any of those type of occupations?" (Emphasis added). Another juror stated, "I work at a funeral home, but it will not affect this." Defense counsel accepted the juror's answer without further questioning. Later, defense counsel asked, "What about any of your family or close friends? Anybody have a spouse or a child or significant other *that is law enforcement* that deals with these type of cases or things every day?" (Emphasis added). When defense counsel asked if any prospective juror "ha[d] any prior knowledge about this particular case," Adriona Burge stated that she had heard about the case on "social media." Defense counsel asked whether

20

any of the prospective jurors had "personally" gotten "involved with the online discussion" about the case or made "any posts or comments" about the case. No prospective jurors responded. Burge was ultimately selected as an alternate juror and then excused prior to the beginning of deliberations. The trial court denied Gray's post-trial motion for a mistrial.

¶43. In *Odom v. State*, 355 So. 2d 1381 (Miss. 1978), our Supreme Court noted that a prospective juror's "failure . . . to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause." *Id.* at 1383. Therefore, the Court held that if

> a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong.

*Id.* (footnote omitted).

¶44. Here, the record does not show that Burge failed to disclose any pertinent information in response to any relevant, direct, and unambiguous question. There is no evidence that Burge personally "work[ed] in" a "funeral home" or any other occupation that might have affected her ability to serve as a juror in the case. Gray alleges that Burge and her husband

21

co-owned a mortuary transport business, but there is no allegation that Burge personally worked in the business. Moreover, when another prospective juror indicated that he actually worked in a funeral home, defense counsel had no further questions for him. Finally, there is no evidence that Burge had any knowledge about the case or even knew her husband had transported the body. That is, there is no evidence that Burge "had substantial knowledge of the information sought to be elicited." *Id.* Therefore, we certainly cannot say that the trial court's denial of Gray's post-trial motion for a mistrial was "clearly . . . wrong." *Id.*

¶45. We also note that as an alternate juror, Burge was excused before deliberations began. The trial court instructed the jury at the outset of the trial not to discuss the case with anyone during the trial, not even among themselves. The court then repeatedly reminded the jury of that instruction throughout the trial. "Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do." *Young v. Guild*, 7 So. 3d 251, 263 (¶39) (Miss. 2009).

¶46. In *Ables v. State*, 850 So. 2d 172 (Miss. Ct. App. 2003), the trial court discovered mid-trial that a juror had failed to disclose that she had significant knowledge about the case even though during voir dire "the trial court and counsel thoroughly questioned the venire about their knowledge of the case and the parties." *Id.* at 175 (¶10). Indeed, when questioned in chambers, the juror admitted that she knew the victim and his brother, that she lived on the street where the murder took place, that she saw the defendant driving up and down the street prior to the murder, that she heard the fatal gunshot, and that her "daughter picked up [the victim] and held him" after he was shot. *Id.* at (¶11). However, the juror stated—consistent

22

with the court's instructions—that she had not discussed the case or shared her knowledge with the other jurors. The trial court dismissed the juror and substituted an alternate, but the court denied the defendant's motion for a mistrial. *Id.* at (¶12). "[T]he trial court found that the jury panel was untainted because [the dismissed juror] stated that she never discussed the case with other jurors," and she was dismissed prior to jury deliberations. *Id.* at 176 (¶15). On appeal, this Court affirmed. *Id.* at (¶16). We reasoned:

> [The juror's] misconduct came to light prior to deliberations, at a time when the jurors had been instructed to refrain from discussing the case amongst themselves. . . . Certainly, [the juror's] concealment was particularly egregious and, had it been discovered after deliberations, would have warranted a new trial. However, deliberations had not yet begun, and there was no showing that [the juror] ever discussed the case with other jurors. The trial court was not clearly wrong in finding that the jury could be fair and impartial notwithstanding [the juror's] misconduct.

*Id.* (citation omitted).

¶47.    Likewise, Burge was dismissed in this case "prior to deliberations, at a time when the jurors had been instructed to refrain from discussing the case amongst themselves." *Id.* As discussed above, there is no evidence that Burge concealed anything or engaged in any "misconduct." But in any event, as in *Ables*, "deliberations had not yet begun, and there was no showing that [Burge] ever discussed the case with other jurors." *Id.* Therefore, as in *Ables*, the trial court's denial of Gray's post-trial motion "was not clearly wrong." *Id.*

¶48.    In summary, Gray waived any objection related to juror Mendoza, there is no evidence in the record that juror Burge withheld any information that should have been disclosed voir dire, and there is no evidence that the presence of either alternate juror *prior to deliberations* prejudiced Gray in any manner. Accordingly, the trial court did not err by denying Gray's

23

post-trial motion for a mistrial.

### V. The fine imposed by the trial court is authorized by statute and not excessive; however, the assessment is reversed and rendered.

¶49. The trial court sentenced Gray to life imprisonment in the custody of the Department of Corrections without eligibility for parole as required by Mississippi Code Annotated section 97-3-21(b) (Rev. 2020) and also ordered him to pay a $5,000.00 fine and "an assessment of $10,000.00 to the Public Defender fund."

¶50. Mississippi Code Annotated section 99-19-32 (Rev. 2020) provides:

> Offenses punishable by imprisonment in the State Penitentiary for more than one (1) year and for which no fine is provided elsewhere by statute may be punishable by a fine not in excess of Ten Thousand Dollars ($10,000.00). Such fine, if imposed, may be in addition to imprisonment or any other punishment or penalty authorized by law.

No other statute provides for a specific fine for capital murder. Therefore, it was within the trial court's discretion to impose a fine of up to $10,000, and the court did not abuse its discretion by imposing a fine ($5,000) that was well within the statutory limits. *See Conley v. State*, 790 So. 2d 773, 805-06 (¶¶129-32) (Miss. 2001).

¶51. Nonetheless, Gray argues that the trial court exceeded its authority because the combined amount of the $5,000 fine and $10,000 assessment ($15,000) exceeds the maximum fine allowed by the statute. In response, the State argues that the assessment is separately authorized by Mississippi Code Annotated section 99-19-73(7) (Rev. 2020). That statute provides that in addition to any other fines, a trial court "shall . . . impose[] and collect[] the following state assessment from each person upon whom [the] court imposes a fine or other penalty for any felony" (other than certain offenses addressed elsewhere in the

24

statute). *Id.* The statute provides for a "state assessment" payable to the "GENERAL FUND" in the amount of "$280.50." *Id.* The statute also lists twenty-one other special funds with assessment amounts that are all shown as "[Deleted]." *Id.* One of these special funds—cited by the State on appeal—is the "Public Defenders Education Fund," with an assessment amount shown as "[Deleted]." *Id.* The State argues that the statute "does not provide a maximum assessment" for the "Public Defenders Education Fund"—because the "AMOUNT" is shown as "[Deleted]." Therefore, the State argues that the trial court's $10,000 assessment "did not exceed that allowed by statute."

¶52. The State's argument misunderstands both the trial court's assessment and the state assessment statute. First, the trial court's assessment was not payable to the state "Public Defenders Education Fund" established in Mississippi Code Annotated section 99-40-1(4)(b) (Rev. 2020) and referenced in the state assessment statute. Rather, the trial court ordered Gray to pay $10,000 to *the county's* "Public Defender Fund" as partial reimbursement to the county for the cost of his court-appointed attorney.

¶53. Second, section 99-19-73(7) does *not* provide trial courts with uncapped authority to order defendants to pay assessments to the "Public Defenders Education Fund" or any of the other special funds listed in the statute. Prior to 2016, the statute provided specific amounts payable to each of the listed special funds—e.g., "$1.00" from each state assessment was payable to the "Public Defenders Education Fund." Miss. Code Ann. § 99-19-73(7) (Rev. 2015). The sum of those amounts resulted in a "TOTAL STATE ASSESSMENT" of "$280.50"—just as today. *Id.* However, in 2016, the Legislature amended the statute to

25

delete the amounts payable to all the listed special funds and to provide that the entire state assessment of $280.50 would be payable to the general fund. *See* 2016 Miss. Laws ch. 459, § 71 (S.B. 2362); 2016 Miss. Laws 2016 ch. 509, § 1 (H.B. 298). This was part of an effort to promote budget transparency by limiting the use of special funds. The 2016 amendments left unchanged the total "state assessment" that the trial court "shall . . . impose[] and collect[]." Miss. Code Ann. § 99-19-73(7) (Supp. 2016). The state assessment remained $280.50. *Id.* The Legislature simply provided that the entire assessment would be paid into the General Fund rather than being paid in varying amounts into twenty-one different special funds. Again, the Legislature did *not* grant trial courts uncapped authority to order additional assessments payable into the various state special funds.

¶54. Accordingly, section 99-19-73(7) clearly does *not* authorize the trial court's order that Gray pay a $10,000 "assessment" to the county "Public Defender Fund." Moreover, the State cites no other authority for such an assessment. Notably, in 2008, then-Circuit Judge Robert P. Chamberlin asked the Attorney General whether a court could "impose an assessment at the end of the case (along with fines, costs and restitution) to go to the county to help defray the costs of a public defender." Miss. Att'y Gen. Op., 2008-00173, 2008 WL 2357988, *Chamberlin*, at *1 (May 23, 2008). In response, the Attorney General opined that "[t]here *is no authority for the imposition of an assessment against an indigent as described in this question*. However, it is the opinion of this office that the court may impose such an assessment against non-indigents." *Id.* at *2 (emphasis added).[11] Here, Gray was found to

---

[11] "Attorney General opinions are not binding, but they certainly are useful in offering guidance to the Court." *Jones Cnty. Sch. Dist. v. Dep't of Revenue*, 111 So. 3d 588, 602

be indigent and was represented at trial by the county public defender's office and additional court-appointed counsel. There was no evidence or finding by the trial court that Gray's financial condition had improved or that he was no longer indigent by the time of sentencing. Consistent with the 2008 Attorney General's opinion, we are not aware of any "authority for the imposition of an assessment against an indigent" defendant to defray the cost of a public defender or court-appointed counsel. *Id.* Certainly, the State has cited no such authority in this appeal. In the absence of any authority for the $10,000 assessment, we reverse and render the assessment void. The remainder of Gray's sentence is affirmed.

## CONCLUSION

¶55. Gray's conviction is affirmed. Gray's sentence is also affirmed except for the "assessment of $10,000.00 to the Public Defender fund." That assessment is reversed and rendered void.

¶56. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**CARLTON, P.J., LAWRENCE, EMFINGER AND WEDDLE, JJ., CONCUR. BARNES, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD, McCARTY AND LASSITTER ST. PÉ, JJ.**

**BARNES, C.J., DISSENTING:**

¶57. I respectfully dissent from the lead opinion's decision to affirm Gray's conviction and sentence. I would hold that the trial court's failure to suppress Gray's interrogation by Detective Gulledge was reversible error; therefore, I would reverse and remand for a new trial.

---

(¶55) (Miss. 2013).

27

¶58. Gray's responses during Detective Gulledge's interrogation on August 2 were fruits of the poisonous tree of the suppressed July 17, 2020 interrogation with Detective Johnson. The trial court erred in not suppressing the August 2, 2020 confession.[12]

¶59. "The 'fruit of the poisonous tree' doctrine" is part of "the exclusionary rule[, which] 'prohibits introduction into evidence of tangible materials'" that were unlawfully obtained as well as "testimony concerning knowledge acquired during an unlawful search." *Green v. State*, 344 So. 3d 854, 857 (¶12) (Miss. 2022) (quoting *Marshall v. State*, 584 So. 2d 437, 438 (Miss. 1991); *Murray v. United States*, 487 U.S. 533, 536 (1988)). The doctrine precludes "the introduction of *derivative evidence*, both tangible and testimonial, that is, the product of the primary evidence, or that is otherwise acquired as a result of the unlawful [obtaining of evidence], up to the point at which the connection becomes 'so attenuated as to dissipate the taint.'" *Id.* (quoting *Murray*, 487 U.S. at 536-37) (citing *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

¶60. "The exclusionary prohibition against 'fruit of the poisonous tree' applies to violations of the Fifth-Amendment privilege against self-incrimination." *Chamberlin v. State*, 989 So. 2d 320, 336 (¶54) (Miss. 2008) (quoting *Brown v. Illinois*, 422 U.S. 590, 599 (1975)). However, "all evidence obtained by virtue of illegal actions of the police is not 'fruit of the poisonous tree.' The test is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality instead of by means sufficiently distinguishable to be purged of the primary taint.'" *Fraise*

---

[12] I concur with the lead opinion's determination that the other derivative evidence was admissible under the inevitable discovery or the independent source doctrines.

28

*v. State*, 17 So. 3d 160, 164 (¶10) (Miss. Ct. App. 2009) (citations omitted).

¶61.    The United States Supreme Court has created two exceptions to the fruit-of-the-poisonous-tree doctrine: the inevitable discovery exception and the independent source exception. *Marshall*, 584 So. 2d at 438 (citing *Nix v. Williams*, 467 U.S. 431, 443-44 (1984); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920)).   Under the inevitable discovery doctrine, unlawfully obtained evidence "will be admissible if it can be shown that this evidence would have ultimately been discovered by constitutionally permissible means." *Pugh v. State*, 101 So. 3d 682, 689 (¶29) (Miss. Ct. App. 2012) (citing *Nix*, 467 U.S. at 444). "In order for the evidence to be admitted, the State must prove the following: '(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation.'" *Id.* (quoting *United States v. Cherry*, 759 F. 2d 1196, 1204 (5th Cir. 1985)).  "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix*, 467 U.S. at 443.

¶62.    The trial court denied Gray's motion to suppress his August 2, 2020 interrogation, finding the confession to Detective Gulledge was voluntary and was not "fruit of the poisonous tree" because it was "sufficiently removed from his [suppressed] July 17, 2020 statement to 'purge the primary taint.'"  I disagree and find the interrogation's admission reversible error because it was an improper continuation of questioning from Detective

29

Johnson's suppressed interrogation.

¶63. On appeal, Gray does not appear to challenge the voluntariness of his August 2 statement to Detective Gulledge. However, the statement must not only be voluntary but must be "sufficiently an act of free will to purge the primary taint." *Keller v. State*, 138 So. 3d 817, 852 (¶79) (Miss. 2014) (quoting *Brown v. Illinois*, 422 U.S. 590, 602 (1975); *Wong Sun*, 371 U.S. at 486). "Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State. Relevant considerations include observance of *Miranda*, '[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'" *Id.* (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)) (referencing *Miranda v. Arizona*, 384 U.S. 436 (1966)).

¶64. After his July 17 statement to Detective Johnson, Gray remained in custody in Colorado until August 2, 2020, when he was flown back to Mississippi on a plane with Detective Gulledge, who took Gray straight to an interrogation room at the Pearl River County jail and proceeded to interrogate him. During his interrogation with Detective Gulledge, Gray did not request counsel (or to speak to his lawyer-father) before or during the interrogation; however, he did not initiate the interrogation—Detective Gulledge did.

¶65. The constitutional principles of custodial interrogations are well established. *Armstrong v. State*, 281 So. 3d 962, 966 (¶12) (Miss. Ct. App. 2019). Under *Miranda*, if the accused invokes his right to remain silent, the interrogation must stop. *Id.* (citing *Miranda*, 384 U.S. at 479). If the accused invokes his right to have an attorney present, the

interrogation must stop until counsel is present. *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). "[F]urther interrogation is absolutely barred until counsel has been made available to [the accused], unless the accused himself initiates further communication." *Balfour v. State*, 598 So. 2d 731, 744-45 (Miss. 1992) (citing *Edwards*, 451 U.S. at 484). Additionally, once the accused has invoked his right to counsel, a valid waiver cannot be established to further police questioning *even if* the accused has been re-advised of his *Miranda* rights. *Id.* at 744.

¶66. Once Gray requested counsel during Detective Johnson's custodial interrogation, any questioning by any law enforcement should have ceased until either counsel was provided or Gray himself reinitiated the questioning. Neither one of these circumstances had occurred when Detective Gulledge continued Gray's interrogation in Mississippi. Therefore, the continuation of the interrogation with Detective Gulledge was improper. Further, Gray's signing another *Miranda* waiver form with Detective Gulledge did not cure the taint of the previous interrogation with Detective Johnson because Gray's invocation of his right to counsel was still active, and he did not initiate Detective Gulledge's interrogation. Moreover, Gray very well could have believed the same coercive promises Detective Johnson made to him were on the table, such as the witness protection program, if he talked. Gray proceeded to give the same inculpatory information during this interrogation as he had provided it to Detective Johnson, additionally admitting that he and Austin threw the murder weapon in Lake Pontchartrain and that they had planned to rob but not murder Willie.

¶67. The trial court suppressed Gray's statement to Detective Johnson because the

31

statement was elicited through coercive tactics and was made without an attorney despite Gray's request for one. The trial court found Gray invoked his right to counsel approximately five minutes after the interrogation began, although the request had some ambiguity (i.e., he was "thinking" of a lawyer to make sure he will not be "thrown away"). The trial court found Johnson should have sought clarification about Gray's request, but she did not, and improperly continued her interrogation.

¶68. The lead opinion contends that Detective Johnson had no duty to clarify Gray's ambiguous request for counsel, a point not argued by the State either here or below. The lead opinion must do so in order to nullify the trial court's holding that Detective Johnson violated Gray's request for counsel because Detective Gulledge, not Gray, initiated the subsequent interrogation. In *Taylor v. State*, 330 So. 3d 758 (Miss. 2021), the Mississippi Supreme Court quoted *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), that "'when an accused has expressed a desire to deal with the police only through counsel, further interrogation is absolutely barred . . . unless the accused himself initiates further communication.'" *Id.* at 766 (¶20). *Taylor* involved two custodial interrogations, ten months apart and in different counties, and regarding different charges. *Id.* at 760 (¶2). Yet the Mississippi Supreme Court held that we incorrectly found that by asking to speak to Sheriff Jones, Taylor initiated the second interrogation because the officers had gone to talk to Taylor, and but for their improper contact, Taylor would not have asked to talk to Sheriff Jones. *Id.* at 768 (¶25). The supreme court further cited *Edwards* and reasoned that even if the second interrogation had a valid *Miranda* waiver, it would not matter because the defendant did not initiate the

32

interrogation. *Id.* at 767 (¶22). In the case before us, there was no allegation that Gray initiated the second interrogation in Mississippi; therefore, it does not matter that he was given a *Miranda* warning again by Detective Gulledge.

¶69. The trial court further found that Detective Johnson used numerous coercive tactics to obtain Gray's statement, making it involuntary. For example, Detective Johnson told Gray she had overheard Gray's telephone conversation with his father and that the father (a lawyer) wanted Gray to cooperate; Gray was going to have to save himself, his wife, and his infant child; Gray and his family's lives were in danger, so he needed her help with protection; they were trying to line up protection for "yall," intimating that Gray's wife might be pulled into the missing-person case because the car with blood in it was also her car; and Detective Johnson could not help Gray until he talked to her, and then he could get a lawyer.

¶70. The lead opinion would find Gray's interrogation with Detective Gulledge voluntary, focusing on the differences between the interrogations of how much time had passed, the change of place, and the change in interrogators to conclude that Gray's second interrogation was admissible. However, Gray was held in Colorado for sixteen days, away from his family. He was separated from his wife, who was also arrested, and infant child. In the interrogations, he showed his concern for their safety, but this concern was used as a coercive measure by Detective Johnson. After Gray was flown on a private plane to Mississippi, he was taken directly to the jail, where he continued to have no contact with his family, including his father who is a lawyer.

¶71. Nothing about the differences in time or location removed the taint of Detective

33

Johnson's improper interrogation. Gray had no contact with family or counsel during the sixteen days before being brought to Mississippi and taken for immediate questioning, which he had not initiated. Detective Gulledge did not cure the coercive promises of assistance Detective Johnson had made by thanking Gray for his cooperation and having him sign a second *Miranda* form.

¶72. Lastly, the lead opinion contends the admission of Detective Gulledge's interrogation was harmless error, but I am unconvinced. The jury may not have believed Austin's testimony but for the confirmatory admissions that Gray made to Detective Gulledge, in which case Gray may have been found guilty only of accessory after the fact rather than as a principal to capital murder. Yet it would be hard for a jury not to believe Gray was a principal once they heard his comment that they "obviously" intended to rob Willie.[13] The admission of Detective Gulledge's interrogation was not harmless error.

¶73. Detective Gulledge's interrogation was an improperly initiated follow-up to Detective Johnson's interrogation. Gray had been in custody in Colorado the entire time between the two interrogations, and once in Mississippi, he was taken directly from the plane to the interrogation room. Gray's statement to Detective Gulledge on August 2 flowed directly from the illegally obtained, suppressed confession that he gave to Detective Johnson on July 17; thus, this statement must be excluded as fruit of the poisonous tree. It was not "sufficiently removed" from the prior July 17 confession to "purge the primary taint."

---

[13] Even though Gray claimed he did not know Austin intended to kill Willie, he would have been guilty under the felony murder doctrine codified in Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2020).

¶74.     I find the trial court abused its discretion in not suppressing Gray's August 2, 2020 interrogation with Detective Gulledge as fruit of the poisonous tree.  Accordingly, I would reverse and remand for a new trial.

**WESTBROOKS, McDONALD, McCARTY AND LASSITTER ST. PÉ, JJ., JOIN THIS OPINION.**